IN RE: R & S ST. ROSE LENDERS, LLC, Debtor.

R & S St. Rose, LLC, Debtor.

Case No.: 11–14973–MKN, Case No.: 11–14974–MKN

United States Bankruptcy Court, D. Nevada.

Date: January 26, 2015, Time: 9:30 a.m.

Signed March 15, 2016

Nedda Ghandi, Ghandi Deeter Law Offices, David J. Merrill, David J. Merrill, P.C., Samuel A. Schwartz, Las Vegas, NV, for Debtor R & S St. Rose Lenders, LLC.

Larson & Stephens, LLC, Bryan A. Lindsey, Schwartz Flansburg PLLC, Samuel A. Schwartz, Las Vegas, NV, for Debtor R & S St. Rose, LLC.

Athanasios E. Agelakopoulos, Las Vegas, NV, for U.S. Trustee.

## MEMORANDUM DECISION ON MOTION FOR SUBSTANTIVE CONSOLIDATION WITH RELATED CHAPTER 11 CASE OF R & S ST. ROSE, LLC [1]

Honorable Mike K. Nakagawa, United States Bankruptcy Judge

On October 27, October 28, November 17, November 18 and November 21, 2014, an evidentiary hearing was conducted on the Motion for Substantive Consolidation with Related Chapter 11 Case of R & S St. Rose, LLC, brought by creditors in the above-captioned Chapter 11 proceeding. The appearances of counsel were noted on the record.

On January 26, 2015, closing arguments were presented. Thereafter, the matter was taken under submission.

On April 24, 2015, the parties submitted proposed findings of fact and conclusions of law.

## BACKGROUND

On April 4, 2011, R & S St. Rose Lenders, LLC ("Lenders") commenced the above-captioned Chapter 11 proceeding. Its voluntary Chapter 11 petition was accompanied by its schedules of assets and liabilities ("Schedules") in addition to its statement of financial affairs. (Lenders ECF No. 1). Lenders' Schedule "A" listed no real property assets. Lenders' personal property Schedule "B" listed two checking accounts totaling $574.38, a claim in the amount of $12 million against R & S St. Rose, LLC and a "judgment against Branch Banking and Trust Company" in the amount of $41,000.

On the same date, R & S St. Rose, LLC ("St. Rose") commenced a separate voluntary Chapter 11 proceeding, denominated Case No. 11–14974–MKN. Its voluntary Chapter 11 petition was accompanied by its schedules of assets and liabilities ("Schedules") in addition to its statement of financial affairs. (St. Rose ECF No. 1). St. Rose's Schedule "A" listed a fee simple interest in approximately 38 acres of raw land located in Henderson, Nevada, at St. Rose Parkway and Jeffries, Assessor Parcel Nos. 177–26–814–001, 177–26–701–019, 177–26–801–011, and 177–26–801–016 ("the Property").

---

1. Unless otherwise specified, all references in this memorandum decision to "Section" are to provisions of the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All references to "NRS" are to provisions of the Nevada Revised Statutes. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure and all references to "FRCP" are to the Federal Rules of Civil Procedure. All references to "ECF No." are to the numbers assigned to the documents filed in the relevant bankruptcy case as they appear on the docket maintained by the clerk of the court for each case. All references to "JE" are to the joint trial exhibits admitted at the evidentiary hearing in this matter; multiple joint trial exhibits are referred to as "JES."

On July 22, 2011, Branch Banking and Trust Company ("BB & T") filed in the Lenders proceeding proof of claim number 29–1 ("POC 29–1"), in an unsecured amount of $38,539,707.47. Attached to POC 29–1 is a summary indicating that the claim is based on a 2007 loan ("Construction Loan") between Colonial Bank, N.A. ("Colonial Bank") and St. Rose, secured by a deed of trust against the Property. The rights under the loan and deed of trust allegedly had been obtained by BB & T from the Federal Deposit Insurance Corporation ("FDIC") as receiver for Colonial Bank. The summary further explains BB & T's contention that its lien against the Property is senior to that of Lenders and references an action previously commenced in state court by Colonial Bank. The summary to POC 29–1 refers to a variety of documents that were not attached to the claim.

On July 26, 2011, Commonwealth Land Title Insurance Company ("Commonwealth") filed in the Lenders proceeding proof of claim number 30–1 ("POC 30–1"), in an unsecured, nonpriority amount to be determined. The attachment to POC 30–1 states as follows:

2. Section 4(b) of the title insurance policy attached as an exhibit to POC 30–1 states in pertinent part as follows: "The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured...." An Endorsement to the Title Policy specifies that Commonwealth insures the lender against loss or damage sustained by the reason of "Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan ..."

3. The consolidated litigation referenced in Commonwealth's POC 30–1 consisted of one

The Creditor notes that the value of the claim is contingent upon the outcome of the *consolidated litigation* currently on appeal, entitled *Murdock v. Fourouzan Rad et al,* and all related claims, Clark County Case Number 08–A574852, Supreme Court of Nevada Case Number 56640. Creditor has potential tort claims for fraud, misrepresentation, and negligence against the Debtor, both of which arise under the conduct of Debtor that gave rise to the subject litigation. *The estimated potential value of such claims is $43,980,000.00, the value of the insurance policy issued by the Creditor, which insured the transaction that is the subject of the above-referenced litigation.*

(Emphasis added). The "transaction that is the subject of the above-referenced litigation" was the Construction Loan made by Colonial Bank to St. Rose in July 2007. Commonwealth, through Nevada Title Company, issued a title insurance policy in the amount of $43,980,000 for the benefit of Colonial Bank.[2] As a result of the transaction, however, a deed of trust that was recorded against the Property in 2005 in favor of Lenders became the subject of the consolidated litigation referenced by Commonwealth in its POC 30–1.[3]

action brought by Robert E. Murdock ("Murdock") and Eckley M. Keach ("Keach") and another action brought by Colonial Bank. The first action brought by Murdock and Reach was commenced in November 2008 in the Eighth Judicial District Court for Clark County, Nevada ("State Court"). That action was brought against Saiid Forouzan Rad ("Rad"), R. Phillip Nourafchan ("Nourafchan"), Forouzan, Inc. ("Forouzan"), RPN, LLC ("RPN"), as well as Lenders and St. Rose, entitled *Murdock, et al. v. Rad, et al.,* Case No. 08–A574852–C. In April 2009, Colonial Bank Group Inc. and R & S Investment Group ("Investment Group") were also added as named defendants.

In July 2009, Colonial Bank, Commonwealth's insured, commenced a separate action in the State Court against St. Rose, and

On July 26, 2011, Commonwealth also filed a second proof of claim, proof of claim number 31-1 ("POC 31-1"), in the unsecured, nonpriority amount of $1,175,905.44 arising from the assignment of a judgment

rendered in the State Court Action against Lenders in favor of Murdock and Keach.

On July 27, 2011, BB & T filed in the Lenders proceeding proof of claim number 43-1 ("POC 43-1"), in an unsecured amount of $38,539,707.47.[4] It references

others, denominated Case No. 09-A-594512-C. Both Colonial Bank and Lenders were secured creditors of St. Rose. Colonial Bank's primary assertion was that Lenders had improperly obtained a lien against the subject Property ahead of Colonial Bank's deed of trust. Shortly after that separate action was commenced, Colonial Bank was placed into a proceeding by which the FDIC became the receiver. Subsequently, BB & T, as the alleged purchaser from the FDIC of the assets of Colonial Bank, filed an amended cross-complaint, again asserting various claims against St. Rose, Lenders, and others. A copy of the amended cross-complaint ("BB & T Cross-Complaint") was attached as an exhibit to proof of claim 5-1 ("POC 5-1") that BB & T subsequently filed in the St. Rose Chapter 11 proceeding. Lenders counterclaimed, seeking a declaration that its deed of trust had priority over Colonial Bank's deed of trust. That separate action in 2009 was consolidated with the prior lawsuit that had been commenced in 2008 by Murdock and Keach. (In this memorandum decision, the consolidated action is referred to as the "State Court Action.")

On January 8, 2010, a ten-day trial of the State Court Action was commenced and concluded on or about April 14, 2010, resulting in a variety of rulings by the State Court. A foreclosure of the Property by Lenders under its deed of trust was scheduled to be conducted on June 1, 2010, and BB & T's request to stay the foreclosure was denied by the State Court.

On May 13, 2010, to prevent the foreclosure by Lenders, BB & T commenced an involuntary Chapter 7 proceeding against St. Rose, denominated Case No. 10-18827-MKN ("Involuntary Proceeding"). As a result of the involuntary Chapter 7 petition filed by BB & T, the foreclosure of the Property as property of the St. Rose bankruptcy estate was prevented by the automatic stay under Section 362(a).

On May 25, 2010, a motion to dismiss the Involuntary Proceeding was filed by Rad and Forouzan (Involuntary Proceeding ECF No.

9) and later joined by Lenders. (Involuntary ECF No. 25).

On June 23, 2010, the State Court entered Findings of Fact and Conclusions of Law determining, *inter alia,* that Lenders' deed of trust has priority over the Colonial Bank deed of trust. That order included 145 findings of fact as well as 31 conclusions of law.

On July 13, 2010, the State Court entered an initial judgment against Lenders-only in favor of Murdock in the amount of $166,741.83 and in favor of Reach in the amount of $1,009,163.61, resulting in a total judgment of $1,175,905.44.

On October 29, 2010, an order was entered dismissing the Involuntary Proceeding. (Involuntary ECF No. 37).

On or about November 5, 2010, a final judgment was entered in the consolidated State Court Action granting judgment in favor of Murdock and Reach against Lenders, granting judgment in favor of Lenders against BB & T as to the priority of Lenders' deed of trust, and dismissing all other claims not previously resolved in the action. BB & T appealed that judgment to the Nevada Supreme Court.

On or about March 31, 2011, Murdock and Reach assigned their rights under the judgment in the consolidated State Court Action to Commonwealth.

On April 4, 2011, Lenders and St. Rose voluntarily commenced their separate Chapter 11 reorganization proceedings.

On May 31, 2013, the judgment reflected by the State Court Order was affirmed by the Nevada Supreme Court. On September 26, 2013, a petition for rehearing was denied. On February 21, 2014, the Nevada Supreme Court denied BB & T's petition for rehearing en banc. BB & T then petitioned for writ of certiorari to the United States Supreme Court. On October 6, 2014, the certiorari petition was denied. *See Branch Banking and Trust Co. v. R & S St. Rose Lenders,* —— U.S. ——, 135 S.Ct. 85, 190 L.Ed.2d 38 (2014).

4. Like POC 29-1, attached to POC 43-1 is a summary indicating that the claim is based on

the amended cross-complaint that BB & T filed in the state court proceeding which included six separate causes of action. The summary further referred to a variety of documents that were not attached to POC 29–1, but which are attached to POC 43–1.[5]

On July 27, 2011, BB & T also filed in the St. Rose proceeding proof of claim number 5–1 ("POC 5–1") in the amount of $38,539,707.47, with $16,820,000 being secured and $21,719,707.47 being unsecured.

On August 2, 2011, Lenders filed a proof of claim in the St. Rose proceeding as Claim 12–1. The total amount of the claim is $27,460,871, with $12,000,000 claimed as secured and the remaining $15,460,871 claimed as unsecured.

On May 1, 2012, BB & T filed a motion to substantively consolidate the two bankruptcy estates ("Consolidation Motion").

(St. Rose ECF No. 116; Lenders ECF No. 135).[6] On June 11, 2012, St. Rose filed opposition to the Consolidation Motion. (St. Rose ECF No. 128).[7] Lenders joined in the opposition. (Lenders ECF No. 153). On the same date, Commonwealth joined in the Consolidation Motion. (Lenders ECF No. 155).[8] On July 3, 2012, BB & T filed a reply. (St. Rose ECF No. 133; Lenders ECF No. 161).[9] On July 19, 2012, the Consolidation Motion was heard and taken under submission.

On September 4, 2012, this court entered an order denying the Consolidation Motion ("Consolidation Order"). (St. Rose ECF No. 168; Lenders ECF No. 172). On September 12, 2012, BB & T filed a notice of appeal to the United States District Court ("USDC") for the District of Nevada. (St. Rose ECF No. 173; Lenders ECF No. 175). On September 18, 2012, Commonwealth also filed an appeal

the Construction Loan obtained by St. Rose from Colonial Bank in 2007.

**5.** The loan transaction between St. Rose and Colonial Bank, as well as the litigation, referenced in the various proofs of claim are all the same and encompassed by the consolidated State Court Action.

**6.** The Consolidation Motion was supported by the Omnibus Declaration of Richard L. Doxey, Esq. (St. Rose ECF No. 117), to which was attached 13 separate exhibits. The exhibits consisted of transcripts of examinations pursuant to FRBP 2004 taken of Rad on October 11, 2011, January 31, 2012 and February 1, 2012, as well as Teresa Cargill on February 1, 2012. Also attached were copies of the 2007 Construction Loan agreement between St. Rose and Colonial Bank, various checks from individual investors, promissory notes from Lenders to individual investors, tax returns for St. Rose and Lenders, a 2007 general ledger for St. Rose, a September 2008 bank statement for Lenders, and an assignment and assumption of certain deed and loan documents between the FDIC and BB & T.

**7.** The opposition to the Consolidation Motion was supported by a declaration from Rad (St.

Rose ECF No. 129) as well as a declaration from Lenders' counsel authenticating a copy of the finding of fact and conclusions of law entered in the State Court Action. (St. Rose ECF Nos. 130 and 136).

**8.** Commonwealth's joinder in the Consolidation Motion was supported by the Declaration of Scott E. Gizer ("Gizer Declaration") (Lenders ECF No. 156), to which was attached the same 2004 examination transcripts of Rad and Teresa Cargill, as well as a copy of portions of the transcripts of an examination of Rebecca Daniels taken on May 18, 2012, and an examination of Michael Broida taken on April 25, 2012 ("Broida Transcript").

**9.** The reply was accompanied by a copy of a guarantee signed by Rad and Nourafchan of the Construction Loan obtained by St. Rose from Colonial Bank as well as a copy of a transcript of the same 2004 examination of Rebecca Daniels. The reply also was accompanied by the Declaration of Thomas Brent Hicks (Lenders ECF No. 134), to which is attached a copy of a Purchase and Assumption Agreement between the FDIC and BB & T dated August 14, 2009, regarding the assets of Colonial Bank.

from the Consolidation Order to the USDC. (St. Rose ECF No. 183; Lenders ECF No. 190). The separate appeals were consolidated and assigned to the Honorable Lloyd D. George, United States District Judge. (St. Rose ECF No. 214; Lenders ECF No. 217).

On August 2, 2013, St. Rose filed a proposed Chapter 11 liquidating plan ("St. Rose Plan"). (St. Rose ECF No. 242).

On September 24, 2013, in the St. Rose Chapter 11 proceeding, BB & T commenced Adversary Proceeding No. 13–01182–MKN against St. Rose and Lenders ("BB & T Adversary Proceeding"). (AECF No. 1).[10] BB & T's complaint ("Adversary Complaint") is framed as seven separate causes of action described as (1) equitable subordination of Lenders' claim under Section 510(c), (2) contractual subrogation,[11] (3) declaratory relief/quiet title, (4) equitable/promissory estoppel, (5) equitable subrogation, (6) declaratory relief limiting the amount of Lenders' secured claim pursuant to NRS 106, and (7) declaratory relief objecting to Lenders POC on grounds that Lenders did not loan moneys to the Debtor.[12]

On October 1, 2013, St. Rose filed a motion to dismiss the BB & T Adversary Proceeding. (AECF No. 4). On October 4, 2013, Lenders joined in the dismissal motion, (AECF No. 9), and filed its own

motion to dismiss. (AECF No. 10). On October 11, 2013, BB & T filed an "omnibus" opposition to both dismissal motions. (AECF No. 16). On October 16, 2013, St. Rose filed a reply. (AECF No. 18). On October 17, 2013, Lenders joined in the St. Rose reply (AECF No. 19) and filed a separate reply in support of its own motion to dismiss. (AECF No. 20). On October 21, 2013, both dismissal motions were heard and taken under submission.

On November 8, 2013, in the St. Rose Chapter 11 proceeding, an order was entered on confirmation of the St. Rose Plan. (St. Rose ECF No. 291). On November 21, 2013, in the St. Rose proceeding, an order was entered approving a sale of the subject Property in accordance with the confirmed St. Rose Plan. (St. Rose ECF No. 302).[13] On November 21, 2013, BB & T filed a notice appealing to the USDC the confirmation of the St. Rose Plan. (ECF No. 306). On November 22, 2013, Commonwealth also filed an appeal of the plan confirmation order. (ECF No. 312). On December 13, 2013, an order was entered denying BB & T's request to stay the plan confirmation order pending appeal. (St. Rose ECF No. 353).

On March 13, 2014, in the Lenders proceeding, an objection to BB & T's POC 29–1 and POC 43–1 was filed by the "Creditor

---

10. "AECF No." refers to the numbers assigned to the documents filed in the BB & T Adversary Proceeding.

11. BB & T's description of its contractual subrogation theory includes a footnote stating that its second, third, fourth and fifth causes of action (contractual subrogation, declaratory relief/quiet title, equitable/promissory estoppel, and equitable subrogation) "were brought in Nevada State Court and are pending appeal; Plaintiff recognizes that the Court may stay these causes of action pending the outcome of a state court appeal involving the parties." Adversary Complaint at 8 n.2.

12. The BB & T Cross–Complaint filed in the consolidated State Court Action was framed as six separate causes of action described as (1) contractual subrogation, (2) declaratory relief/quiet title, (3) equitable/promissory estoppel, (4) unjust enrichment, (5) fraudulent misrepresentation, and (6) civil conspiracy.

13. Under the sale order, the Property was sold for the purchase price of $13,500,000, with the liens in favor of Lenders and Colonial Bank attaching to the proceeds of sale.

Group." (Lenders ECF No. 306).[14]

On March 27, 2014, an order was entered by the USDC vacating the bankruptcy court's Consolidation Order and remanding the matter to the bankruptcy court for further proceedings ("Remand Order"). (St. Rose ECF No. 378; Lenders ECF No. 312).

On April 1, 2014, BB & T filed its response to the Creditor Group's objection to POC 29–1 and POC 43–1. (Lenders ECF No. 313). On April 9, 2014, the Creditor Group filed its reply. (Lenders ECF No. 323). The objection to BB & T's claims was heard on April 16, 2014, and the matter was taken under submission.[15]

On June 3, 2014, an order was entered sustaining the Creditor Group's objection to POC 43–1 and disallowing BB & T's claims ("BB & T Disallowance Order"). (Lenders ECF No. 365).

On June 3, 2014, a separate order was entered in the BB & T Adversary Proceeding granting in part and denying in part the motions to dismiss ("BB & T Adversary Dismissal Order") that had been brought by St. Rose and Lenders. (AECF No. 32). The motions were denied as to the seventh cause of action seeking a declaration as to the amount of Lenders' claim. As to all other causes of action encompassed by the Complaint, the motions to dismiss were granted under principles of res judicata.

On June 12, 2014, in the Lenders proceeding, a claim objection was filed by the Creditor Group with respect to Commonwealth's POC 30–1. (Lenders ECF No. 384). On July 2, 2014, Commonwealth

filed an opposition. (Lenders ECF No. 401). On July 10, 2014, the Creditor Group filed its reply. (Lenders ECF No. 415).

On July 15, 2014, a stipulation was filed regarding further substantive consolidation proceedings after remand on the Consolidation Motion. (Lenders ECF No. 421). Discovery and supplemental briefing deadlines were established.

On August 7, 2014, an order was entered by the USDC affirming the bankruptcy court's order confirming the St. Rose Plan. (St. Rose ECF No. 446).

On August 12, 2014, an order was entered sustaining the Creditor Group's objection to Commonwealth's POC 30–1. (Lenders ECF No. 447). On August 26, 2014, Commonwealth appealed that order. (Lenders ECF No. 454).

On September 19, 2014, BB & T filed its witness list for the evidentiary hearing on the Consolidation Motion. (Lenders ECF No. 470). On September 26, 2014, BB & T filed its exhibit list. (Lenders ECF No. 477).

On October 6, 2014, BB & T filed a first amended exhibit list. (Lenders ECF No. 485).

On October 7, 2014, and order was entered continuing the evidentiary hearing date on the Consolidation Motion as well as certain related deadlines. (Lenders ECF No. 487).

On October 17, 2014, designations of various deposition testimony were filed by Commonwealth, BB & T, Lenders, St. Rose, and the Creditor Group. (Lenders

---

14. The Creditor Group consists of various individuals and related entities who filed proofs of claim in the Lenders bankruptcy proceeding and who are all represented by the same counsel. Under FRBP 2019(b) and FRBP 2019(d), counsel filed the disclosures of information required by FRBP 2019(c). (Lenders ECF Nos. 263, 268, and 282).

15. At the hearing, BB & T conceded that POC 29–1 had been superseded by POC 43–1, and therefore, POC 29–1 should be treated as withdrawn.

ECF Nos. 501, 502, 503). On the same date, Lenders filed its designation of exhibits ("Lenders Exhibit Designation"). (Lenders ECF No. 505).

On October 21, 2014, Commonwealth filed its supplemental brief in support of the Consolidation Motion (Lenders ECF No. 506), along with the Declaration of Scott E. Gizer. (Lenders ECF No. 507). On the same date, BB & T filed its supplemental brief in support of the motion. (Lenders ECF No. 508). On the same date, St. Rose filed its supplemental brief in opposition to the Consolidation Motion. (St. Rose ECF No. 491). On October 22, 2014, the Creditor Group joined in the supplemental brief filed by St. Rose. (Lenders ECF No. 510).

On October 22, 2014, BB & T filed a motion in limine with respect to a commercial shared-loss agreement between BB & T and the FDIC as well as BB & T's claims against third parties. (Lenders ECF No. 512).

On October 23, 2014, Commonwealth filed objections to certain of the deposition designations filed by Lenders, St. Rose, and the Creditor Group. (Lenders ECF No. 517). On October 24, 2014, BB & T filed objections to certain of the deposition designations of the same parties. (Lenders ECF No. 518).

On October 24, 2014, Commonwealth filed objections to certain exhibits included in a joint list that had not been filed with the court. (ECF No. 519). On the same date, Lenders filed objections to certain exhibits designated by both BB & T and Commonwealth. (Lenders ECF No. 520). The Creditor Group joined in Lenders' objection to the exhibit designations (Lenders ECF No. 522), along with St. Rose (Lenders ECF No. 525) and Investment Group (Lenders ECF No. 529). Lenders also objected to certain of the deposition designations of both BB & T and Commonwealth. (Lenders ECF No. 521). The Creditor Group joined in Lenders' objections to the deposition designations (Lenders ECF No. 523) along with St. Rose. (Lenders ECF No. 524).

On October 26, 2014, St. Rose filed objections to BB & T's motion in limine (Lenders ECF No. 526), and joinders in those objections were filed by Lenders (Lenders ECF No. 527), the Creditors Group (Lenders ECF No. 528), and Investment Group (Lenders ECF No. 530).

On October 27, 2014, the evidentiary hearing commenced.

On November 21, 2014, the evidentiary hearing was completed.

On January 9, 2015, BB & T submitted its closing brief ("BB & T Closing"). (Lenders ECF No. 598). Commonwealth submitted its closing brief ("Commonwealth Closing"). (Lenders ECF No. 600). St. Rose submitted its closing brief ("St. Rose Closing"). (Lenders ECF No. 599). Joinders in the St. Rose Closing brief were filed by Investment Group (Lenders ECF No. 601), the Creditor Group (Lenders ECF No. 604), and Lenders ("Lenders Closing"). (Lenders ECF No. 602). Because the joinder filed by Lenders included additional legal arguments, an additional joinder was filed by Investment Group. (Lenders ECF No. 603).

On January 26, 2015, closing arguments were presented.

On April 24, 2015, proposed findings of fact and conclusions of law were submitted by all parties. (Lenders ECF Nos. 652 and 653).

## WITNESSES PRESENTED

Ten witnesses testified before the court and were subject to cross-examination. Portions of the video deposition testimony of five additional witnesses were admitted

into evidence. Portions of the deposition transcripts of five additional witnesses also were read into the record. Portions of a deposition transcript of one additional witness also was admitted into evidence without being read into the record.[16]

### A. *Live Witness Testimony*

The following witnesses were called to testify in person at the evidentiary hearing and were subject to direct and cross-examination by all counsel.

### 1. *Robert Murdock*

Murdock is an attorney who does real estate transactions with attorney Keach. On August 16, 2005, Murdock received an email (JE 166) from Bradley Burns ("Burns") regarding the Property. Burns was a family friend of Murdock. Based on the email, Murdock testified that he believed that he and others were being offered an opportunity to loan money to St. Rose, secured by a second deed of trust against the Property. He understood that St. Rose was owned by individuals named Phillip and Saiid. The latter were friends of Burns whom Murdock had never met. Murdock also showed the email to Keach.

Murdock testified that he believed he was lending funds to the entity that would acquire the Property. Both he and Keach loaned significant sums of money. The funds were wire transferred before August 23, 2005. Murdock testified that he made the loan because of his friendship with Burns and because of the points and interest to be received. He testified that he believed he would receive a second deed of trust against the Property.

Murdock received a promissory note in the amount of his loan dated September 1, 2005. (JE 49). He testified that he did not notice that the name of the borrower was Lenders. Murdock also testified that the promissory note was accompanied by a transmittal letter dated September 6, 2005. (JE 293). That letter indicated that a copy of a deed of trust and an operating agreement for Lenders would be provided when available.

Murdock also acknowledged receiving a letter dated November 2, 2005 (JE 220), enclosing a copy of an operating agreement for Lenders ("Lenders Operating Agreement"). (JES 2 and 406). He testified that he never received a copy of a deed of trust, but testified that he believed all lenders would receive their own second deed of trust against the Property.

Murdock also testified that until he received a letter from Lenders in October 2008 (JE 688), neither he nor Keach knew about Lenders. Moreover, until he received that letter, Murdock also was unaware that only Lenders held a second deed of trust against the Property, rather than Murdock himself.

Murdock testified that he had been receiving checks for interest payments on his promissory note from St. Rose. For example, one such check (JE 449) made no reference to Lenders. As an additional example, he testified that St. Rose issued IRS 1099–INT forms (JE 419) rather than Lenders.

Murdock further testified that in February 2007, he received a letter from St. Rose, not Lenders, requesting an exten-

---

**16.** On November 19, 2014, an order was entered (Lenders ECF No. 564) conditionally granting Commonwealth's request to admit portions of the Broida Transcript. That excerpt was attached as Exhibit "G" to the Gizer Declaration. *See* note 8, *supra.* On November 21, 2014, Lenders filed its designa-

tion of additional portions of the Broida Transcript as permitted by the conditional order. The order admitted all of the designated portions of the Broida Transcript into evidence without requiring that the portions be read into the record in open court.

sion of his loan. (JE 177). He testified that he received more letters requesting additional extensions (JES 178 and 266) of the loan from St. Rose, Rad or Burns, but not from Lenders.

Murdock testified that he commenced the State Court Action and named St. Rose, Lenders, Nourafchan and Rad as defendants even though the promissory note referred only to Lenders. Murdock testified that the amended complaint in the State Court Action acknowledged receipt of the Lenders Operating Agreement. He testified that he and Reach sought summary judgment solely against Lenders because Lenders was the easiest defendant to pursue. Murdock testified that they received a judgment solely against Lenders, which was thereafter assigned to Commonwealth, in exchange for $950,000.

Murdock testified that he did not at any point in time understand the difference between St. Rose and Lenders.[17]

### 2. *Charles McCall*

Charles McCall ("McCall") is the national major claims counsel for Fidelity National Title Group, of which Commonwealth is a wholly-owned subsidiary. Nevada Title, as agent for Commonwealth[18], issued the title insurance policy regarding the Construction Loan that St. Rose obtained from Colonial Bank in 2007. (JES 405 and 596). McCall testified that Commonwealth approved Nevada Title's issuance of the subject title policy, but that Nevada Title no longer is an agent for Commonwealth.

McCall testified that if BB & T, as successor in interest to Colonial Bank, is paid on a claim against the title policy, Commonwealth would be subrogated to BB & T's rights under its proof of claim. He testified that Colonial Bank had made a claim on the policy, but Commonwealth hired counsel to represent Colonial Bank in the State Court Action rather than paying the claim. McCall also testified that Commonwealth's in-house counsel, Shawn McCann, attended the trial. McCall acknowledged that St. Rose, Lenders, and their owners or members, as well as any lenders to Lenders, are not beneficiaries of the title policy. He testified that Commonwealth has claims against Nevada Title that are still pending in federal court.

McCall testified that Commonwealth entered into an agreement on March 20, 2011 (JE 189) to purchase the judgment in the State Court Action that Murdock and Keach obtained against Lenders.

### 3. *Thomas Hicks*

Thomas Hicks ("Hicks") is a certified public accountant and senior vice president in risk management with BB & T. Prior to joining BB & T, he was employed by Colonial Bank from October 2005 through August 2009. He was chief accounting officer for Colonial Bank at the time the FDIC was appointed as receiver on August 14, 2009. Hicks testified that the FDIC, as receiver, sold the core assets of Colonial Bank to BB & T under a purchase and assumption agreement dated August 14, 2009 (JE 170) and that BB & T did no due diligence as to any individual loans. He testified that the receiver had an electronic tape or Excel file that may have had a

17. Murdock, as well as Reach, appear to be strategists in BB & T and Commonwealth's litigation against St. Rose and Lenders (JES 197, 199 and 200), and also are required to assist Commonwealth in pursuit of the judgment they assigned to Commonwealth. (JE 189).

18. McCall did not testify as to the length of the agency relationship between Commonwealth and Nevada Title, but copies of the agency agreements and amendments thereto were admitted into evidence by stipulation of counsel. (JES 190, 191, 192, 193, and 194).

variety of information such as loan numbers, borrower names, balances due, collateral descriptions and values, and other information as contained in the Colonial Bank records, including the priority of collateral securing any loan. Hicks testified that he had no involvement in BB & T's due diligence in acquiring the Colonial Bank assets nor did he know whether BB & T did anything to review the available data.

Hicks testified that the purchase and assumption agreement also incorporated a commercial shared-loss agreement ("CSLA") that requires BB & T to pursue commercially reasonable efforts to collect on the acquired loans from the borrowers and other sources. Losses resulting after such efforts are accounted for and shared between BB & T and the FDIC.[19]

Hicks further testified that BB & T has possession of Colonial Bank's file (JE 596) for the Construction Loan.[20] He testified that a loan committee memorandum reflected that Colonial Bank was requesting a first deed of trust against the Property as collateral for that loan. Hicks also testified that for repayment of the requested loan, Colonial Bank would first look to its collateral and then to the personal guarantors, Nourafchan and Rad.

Hicks also testified that Colonial Bank had a previous loan agreement ("Acquisition Loan Agreement") with St. Rose dated August 16, 2005. (JE 399). That agreement provides for Colonial Bank to loan $29,305,250 to St. Rose to assist in purchasing the Property ("Acquisition Loan"). He acknowledged that the disbursement provisions of the Acquisition Loan Agreement required Colonial Bank to receive a title policy insuring that the lender had a first lien against the Property. Hicks also testified that Colonial Bank received a deed of trust (JE 400) to secure the Acquisition Loan as well as title insurance.

Hicks testified that Colonial Bank later agreed to modify the Acquisition Loan and included a subordination agreement dated May 17, 2007, that was recorded on June 4, 2007. (JE 154). He acknowledged that a copy of the subordination agreement was included in Colonial Bank's loan file and that the subordination agreement pertained to Lenders' deed of trust against the Property. Hicks testified that the loan file also included a construction loan agreement dated July 27, 2007, to which Lenders was not a party. (JE 404). He acknowledged that the disbursement provisions of the 2007 construction loan agreement required Colonial Bank to receive a title policy insuring the deed of trust as a lien against the Property but did not state that the lien must be in first position. Hicks also testified that Exhibit B to that agreement addressed the conditions for disbursements occurring after the 2005 Acquisition Loan was paid off by the 2007 Construction Loan. He acknowledged that Exhibit B states that there must be evidence that the Colonial Bank's deed of

---

**19.** The degree to which a CSLA correctly allocates the risk between the FDIC and any bank that acquires the assets of a failed institution, and results in a meaningful recovery to the acquiring bank, is subject to debate. *See generally* R. Gaudet, Loss–Sharing Agreements Between the FDIC and Acquiring Banks: Advice for the Borrower, ABI Journal, Volume XXIX, No. 3, April 2010. Moreover, because a CSLA with the FDIC typically encompasses an entire portfolio of assets administered by an acquiring bank, there is no assurance that a shared loss recovery on a particular loan adequately accounts for shared loss recoveries on other loans.

**20.** JE 596 consists of 487 pages to which Lenders objected to the admission of certain specific pages. The court overruled the objections in an order entered on November 3, 2014. (Lenders ECF No. 541).

trust constitutes a first lien as a condition of subsequent disbursements.

Hicks further testified that counsel for Colonial Bank drafted escrow instructions dated July 27, 2007 (JES 167 and 596) directing Nevada Title to record the deed of trust securing the Construction Loan. He acknowledged that the escrow instructions provided for the title insurance policy to be subject only to certain exceptions appearing in the preliminary title report dated June 20, 2007 (JE 168), but not the exception identified as the deed of trust in favor of Lenders (JE 401) recorded on September 16, 2005 (or August 23, 2005). Hicks testified that the required title insurance policy was received in connection with the Construction Loan. (JES 405 and 596).

### 4. *Saiid Forouzan Rad* [21]

Rad has been a real estate investor and developer in both California and Nevada since 1987. He started in a partnership that year with Nourafchan after he immigrated to the United States. Rad testified that he was in charge of the financial aspects of the partnership while Nourafchan was responsible for managing the development of the various real estate projects.

Rad testified that his real estate projects are conducted through single-purpose entities, the majority of which start with "R & S" representing Nourafchan's Persian name "Rafi" and Rad's name Saiid. He believes he opened an office in Nevada in the mid 1990s. Rad testified that Investment Group was formed to oversee all of the projects. From around 1990 to 2005, he testified that Investment Group engaged in approximately three dozen projects and he would have to raise the financing. He testified that over the years, he contacted more than 100 individual investors by telephone. Rad testified that if an investor wanted additional written information, it would be provided through Investment Group on its stationery. Investors would be given membership shares in the particular limited liability company that was formed for the particular property.

Rad testified that after a property was located, the project was syndicated by approaching various individuals, a majority from Iran, to invest. Until a buyer for the project was located, funds were not borrowed from a bank for physical improvements.

Rad testified that there was a hot market for real estate in Las Vegas in 2005. He testified that there were a couple of dozen projects he was working on at that time and that they were issuing hundreds of checks each month.

Rad testified that St. Rose was formed for the Property and that it has two managers, Forouzan and RPN. Rad is the president of Forouzan while RPN stands for Rafi Phillip Nourafchan. Forouzan and RPN also are the member managers of Investment Group and Lenders.

Rad testified that he received a telephone call about the Property in 2005 from Burns. He understood from Burns that Centex needed assistance in acquiring the Property, but that there were only 10–12 days to close. Rad testified that the transaction contemplated the Property being purchased for $45,000,000, with Centex purchasing the Property a year later for $54,000,000. He testified that he contacted Colonial Bank to see if purchase funding could be put together. Rad testified that

---

**21.** Rad testified at length over the course of two days at the evidentiary hearing. This non-sequential summary of his testimony roughly follows the order in which his testimony was elicited at the hearing.

after receiving some level of approval from Colonial Bank, he started calling potential lenders.

Rad testified that individuals he contacted by telephone were informed that they would be lending for the purchase of real estate rather than investing in real estate. He testified that he told the individuals that their loans would mature in 12 to 18 months. Rad testified that individual lenders were told to contact his bookkeeper, Teresa Cargill ("Cargill"), to get information for transferring or sending their money. He does not know what Cargill in fact said to those who called, but he acknowledged that Cargill was an authorized representative of both St. Rose and Lenders. Rad testified that he did not speak to all of the individuals who loaned money to the project but that some were brought in by other lenders. He testified that he does not know what was said to the lenders that he did not speak to and believes that he spoke directly to the majority of the individuals. Rad testified that the majority of individuals he spoke to wanted to know if there was a bank loan, and it was important that Centex was putting $8 million into the project and that there would be another $14 million spent for improvements. He testified that the interest rate on the loans also was an important factor.

Rad testified that there were two loans from Colonial Bank with respect to the Property, the first of which was repaid and the second of which, a construction loan, was not paid. Both loans were personally guarantied by Nourafchan and Rad. He testified that there is an outstanding balance of approximately $33 million on the second loan.

Rad testified that he assumes he wrote the letter dated October 10, 2008, addressed to Keach. (JE 688). He testified that in 2005, individual lenders were informed that they would be paid after Colonial Bank was repaid. Rad testified that the letter was asking Reach to have more patience while St. Rose was attempting to sell the Property.

Rad testified that the funds received from individual lenders in 2005 went either to Investment Group or directly to the escrow company because Lenders did not have a bank account at that time. He testified that Cargill had purchased so many checks for St. Rose that she did not want to open another account for Lenders,[22] even though he had asked her to do so several times. Rad testified that he could have opened a checking account for Lenders in 2005 and initially might have received checks without charge. He does not know what it would cost to order checks. Rad testified that Cargill was employed by Investment Group but also did work on behalf of St. Rose. He understands that as the managing member of St. Rose, he had authority to direct Cargill to make payments to Lenders' creditors on St. Rose's behalf.

Rad testified that in 2005, Investment Group had many other assets. He testified that in 2005, lenders were sending

---

**22.** It is not clear when the primary St. Rose checking account at Colonial Bank was opened. Around the time St. Rose acquired the Property in August 2005, checks were written to some individual lenders for the "points charges" on their loans. (JES 325, 477 and 481). Those payments, along with a payment to Nevada Title to close escrow on the purchase of the Property by St. Rose (JE 616), were not through pre-printed checks

and were all from the same checking account held by St. Rose at Colonial Bank. Later payments from the same Colonial Bank account for monthly interest payments to George Nyman, beginning as check number 1024 dated September 20, 2005 and ending as check number 4540 dated September 1, 2008, were written on pre-printed checks. (JE 372).

checks and wire transfers to Investment Group for the purpose of the project. Some of the lenders wired transferred funds to the escrow for St. Rose to purchase the Property. He testified that he told all of the individual lenders he spoke to that their wire transfers were for the purpose of Lenders. Rad testified that he told all of the individual lenders writing checks to send them directly to escrow because there was only 10 or 12 days to close escrow. He testified that the checks made out to St. Rose were deposited into the St. Rose account by Cargill while checks made out to Investment Group were deposited into the Investment Group account. Rad testified that the funds received by Investment Group were then deposited with the escrow company. He testified that he had put $2.75 million of his own funds into the project and Nourafchan did so as well.

Rad testified that he recognized a check dated August 1, 2005, in the amount of $50,000 from ADDA Enterprises payable to St. Rose. (JE 450). He testified that he was not exactly sure when Lenders was formed, but thinks it was around the same time as the check. Rad testified that Merle Harris solicited the check, but does not know how ADDA Enterprises was instructed to fill out its check. He testified that he recognized another check dated August 1, 2005, in the amount of $50,000 from William M. Wetsman, Trustee, payable to St. Rose. (JE 451). He testified that the check was made out to St. Rose but it was for the purpose of Lenders because Lenders did not have a bank account in 2005. Rad testified he recognized another check dated August 1, 2005, in the amount of $100,000 from William M. Wetsman Trust payable to St. Rose. (JE 452). Rad testified that he never spoke to the issuers of the checks and does not know what they were told by Merle Harris. He testified that he explained to Merle Harris that Lenders eventually would be formed to encompass the individual lenders who participated in lending to St. Rose. Rad testified that he does not know whether Merle Harris ever explained this when he solicited loans from other individual lenders.

Rad testified that he recognized an undated check in the amount of $300,000 from Merle Harris TTEE payable to St. Rose. (JE 463). He testified that he had told Merle Harris that a bank account for Lenders had not been opened yet. Rad testified that he did not tell Merle Harris that an account for Lenders was not opened because Cargill had ordered too many St. Rose checks.

Rad testified that a letter he signed, dated November 21, 2006, to Merle Harris (JE 360) referred to a $100,000 loan to St. Rose, but that he did not mean St. Rose. That letter was on Investment Group stationery.

Rad also testified that a previous letter (JE 359) was faxed to Merle Harris on August 1, 2005, again on Investment Group stationery, giving instructions for wire transferring funds to the St. Rose account. He testified that Merle Harris was not instructed to wire funds to Lenders because an account for Lenders was not established at that time. Rad testified that Merle Harris was not a member manager of Lenders on August 1, 2005. He testified that on August 2, 2005, articles of organization for Lenders (JE 1) were filed with the Nevada Secretary of State. Rad testified that while those articles list Merle Harris as a manager or member of Lenders, they were later amended on a date that he does not recall. He does not recall discussing with Merle Harris that he would be listed as a manager or member of Lenders.

Rad testified that a check dated January 24, 2006, was written in the amount of $100,000 from Forouzan Partnership to St. Rose. (JE 383). He testified that the memo line on the check referring to a loan to St. Rose was written by Cargill. Rad testified that Cargill was aware of the existence of Lenders when she wrote a letter on November 2, 2005, to Murdock and Keach that enclosed a copy of the Lenders Operating Agreement and the promissory note payable to Reach. (JE 220). He testified that Cargill made a mistake when she wrote on the memo line that the funds were for a loan to St. Rose rather than Lenders. Rad testified that there was sloppiness and a lot of mistakes in how checks were written because there were only 10 to 12 days, plus or minus one or two days, to close escrow on the purchase of the Property.

Rad testified that there was a check dated July 25, 2005, in the amount of $500,000 from Jeffrey A. Harris payable to St. Rose. (JE 456).[23] He testified that there was another check dated August 15, 2005, in the amount of $900,000 from Mehrdad Danialifar and Vida Danialifar payable to Rad and Nourafchan. (JE 472). Rad testified that the check does not have a memo line stating that is was for the benefit of Lenders, but it could have gone directly to the escrow for the purchase of the Property or into the Investment Group account. He testified that the check from the Danialifars was written 21 days after the check from Jeffrey Harris, rather than within 10 or 12 days. Rad testified that there were two separate checks payable to St. Rose dated August 21, 2005, both in the amount of $100,000, from Poopak Nourafchan and Romyar Nourafchan. (JE 479). He testified that

these checks were written 27 days after the Jeffrey Harris check. Rad explained that the loans from some of the lenders were for the purpose of completing the purchase of the Property while some of the later funds may have been for the purpose of paying interest, property taxes and administrative costs. He testified that the amount advanced by the individual lenders eventually totaled over $19 million.

Rad testified that the purchase of the Property was supposed to close in the middle of August 2005, based on his review of the deed of trust in favor of Colonial Bank dated August 16, 2005, that was not recorded until August 26, 2005. (JE 213). He acknowledged that the closing took place 32 days after the Jeffrey Harris check was written and that he may have been mistaken. Rad testified that a check dated November 13, 2006, in the amount of $100,000 from Richard P. Baks was payable to St. Rose. (JE 467). He testified that the check written 17 months after close of escrow was for Lenders even though he does not know what Merle Harris told the individual lender. Rad testified that another check dated April 20, 2006, in the amount of $550,000 from Yehuda Ohebsion, Sousan Ohebsion and Sassan Ohebsion was payable to St. Rose. (JE 474). He acknowledged that the check was written eight or nine months after escrow closed and that the memo line on the check did not say anything about Lenders. Rad testified that some of the moneys received after close of escrow were used to substitute later individual lenders for previous lenders. He acknowledged that all of the checks received after the August 26, 2005, closing were made out to either Investment Group or St. Rose.

---

23. This check obviously predates the August 2, 2005 filing of the articles of organization for Lenders. (JES 2 and 203).

Rad testified that a check in the amount of $400,000, apparently dated April 29, 2006, was written to Nourafchan and Rad from R. Setareh. (JE 523). He testified that the issuer wanted to make sure that Nourafchan and Rad were personally obligated on the loan, but that a promissory note was issued by Lenders. Rad testified that the check probably was deposited into Investment Group and then went to St. Rose because Lenders did not have a bank account at the time. He testified that R. Setareh has died and has not made a claim against Nourafchan or Rad for the loans to St. Rose. Rad testified that other individual lenders, Murdock, Keach, and George Nyman, have made claims against Nourafchan and Rad based on loans to the project.

Rad testified that the promissory notes given by Lenders to various lenders had the same language, such as one dated August 19, 2005, from Lenders to Investment Group. (JE 5). He testified that Paragraphs 15 and 16 of the note refer to guarantors, but that there were no guarantors of the notes issued by Lenders. Rad testified that the guarantor language was boilerplate in a form used in a rush and without paying attention to the fact that the form did not correspond with their intent. He did not have an attorney draft the documents.[24] Rad testified that none of the individual lenders had an opportunity to negotiate the terms of the promissory notes, and they all understood that Lenders would pay the notes only after the Property was sold because Lenders did not have cash of its own to repay the notes.

Rad testified that a separate promissory note dated August 23, 2005, in the amount of $12,000,000 by St. Rose in favor of Lenders (JE 3) does not include the boilerplate language used in Lenders' notes to individual lenders. He testified that the $12 million promissory note was never modified to include the additional $7 million that eventually was loaned for the project by individual lenders. Rad testified that the deed of trust (JE 4) securing that promissory note was recorded at the end of August 2005[25] and that the deed of trust was never modified. He testified that the deed of trust against the Property was the security for the individual lenders' promissory notes.

Rad testified that a promissory note dated August 19, 2005, in the amount of $500,000 was issued in favor of Majid Tabibzadeh and Debbie Elghanian, with Rad and Nourafchan as the makers. (JE 387). He testified that those lenders wanted to have more guaranties from them individually so the note was issued by Rad and Nourafchan instead of by Lenders.[26] Rad

24. All of the promissory notes issued by Lenders are signed by Rad and Nourafchan as managers, respectively, of Forouzan and RPN. The last sentence of Paragraph 15 of each note states that "The undersigned are jointly and severally liable hereunder." This includes the promissory notes to individual lenders whose funds were used in the rush to close escrow on the purchase of the Property, as well as those individual lenders whose later funds were used for other purposes. Additionally, this language was included the notes issued not only in favor of Investment Group, but also the notes issued to Murdock (JE 49), Keach (JE 47), George Nyman (JE 364), Poopak Nourafchan (JE 12), and Rom-

yar Nourafchan (JE 14). Whether the last sentence of Paragraph 15 of each note means that Rad and Nourafchan, both of whom apparently signed each note, are individually liable on the promissory notes to all of the individual lenders, is not before the court.

25. It appears that the deed of trust was recorded on September 16, 2005, rather than at the end of August.

26. Even though individual lender R. Sitareh also requested that Rad and Nourafchan be personally obligated for his loan but received a promissory note only from Lenders, Rad

testified that the promissory note to Majid Tabibzadeh and Debbie Elghanian has not been repaid but that the lenders have not yet made a claim against him.

Rad testified that the St. Rose checking account statement for August 2005 (JE 499) reflected $10,425,015 in deposits and a debit of $10,300,000. He testified that the $10,300,000 debit was for the escrow to purchase the Property. Rad testified that the funds from the individual lenders would have been shown on the tax returns for St. Rose. He testified that because a bank account for Lenders had not been established, tax returns for Lenders could not be filed. Rad testified that an employer identification number had been established for Lenders as of August 10, 2005. (JE 208). He testified that he depends on his accountants to prepare the forms required to comply with the tax requirements.

Rad testified that he probably signed a Form 1065 U.S. Return of Partnership Income prepared for St. Rose for the 2005 tax year. (JE 413). He testified that before signing them, he reviewed all such returns for accuracy for all of the single purpose entities he used for real estate projects. He testified that the accountant who prepared the 2005 return would have received the required information from representatives in his office. Rad acknowledged that the 2005 return showed a liability of $11,145,000 for loans payable to the Merle Harris group, the Brad Burns group, and Investment Group.

Rad testified that he probably signed the St. Rose tax return for the 2006 tax year. (JE 414). He testified that he reviewed the return before signing it, that the information was provided by his office

to the accountant who prepared the return, and that it showed a liability to the same groups.

Rad testified that he probably signed the St. Rose tax return for the 2007 tax year. (JE 415). He testified that it showed a liability to the same groups, but that the amounts owed had grown because there were additional lenders who provided funds for costs, interest expenses, administrative expenses, and changes of lenders.

Rad testified that he probably signed the St. Rose tax return for the 2008 tax year. (JE 416). He testified that the return was filed on an extension granted through September 15, 2009. Rad testified that the return shows a correction of the liabilities owed to refer to Lenders for the first time, rather than being owed to the Merle Harris group, the Brad Burns group, and Investment Group.

Rad testified that 1099–INTs forms were reviewed by the office manager and probably by the accountant before they were sent to individual lenders. He testified that 1099–INTs were issued by St. Rose for 2005 (JE 423), 2006 (JE 422), and 2007 (JE 421), but that the Internal Revenue Service was never informed that St. Rose was making the interest payments on behalf of Lenders. Rad acknowledged that the 1099–INTs received by the individual lenders do not state that they received interest on behalf of Lenders.

Rad testified that 1099–INTs for the 2008 tax year (JE 420)[27] were issued by Lenders. He testified that Lenders had no general ledgers in 2005, 2006 and 2007, but he does not know whether Lenders

was not asked to explain this difference in treatment.

27. JE 420 is a 1099–MISC for 2008 issued by Lenders, not a 1099–INT. Rad testified that 1099–INTs for 2008 (JE 419) were issued by St. Rose, rather than Lenders.

had any general ledgers during any period of time in 2008.

Rad testified that he discussed with Cargill an email dated July 9, 2008 (JE 277), that she received from Brenda Burns at Nevada Title concerning a reconveyance of Lender's deed of trust. He testified that he also received an email from Brenda Burns dated September 5, 2008 (JE 376) in which she transmitted copies of the deeds of trust then recorded against the Property. Rad testified that he had sought the copies at the request of his attorney, Behzad Nahai. He acknowledged that the 2008 tax return for St. Rose was filed on an extension after the emails were received from Brenda Burns.

Rad testified that he recognized a balance sheet for Lenders as of September 8, 2008 generated on September 10, 2008. (JE 162). He testified that Rebecca Daniels probably set up the general ledger. Rad testified that he does not know whether a general ledger and financial records for Lenders had ever been set up before receiving the September 5, 2008 email from Brenda Burns. He testified that he had been told by his accountants that in QuickBooks, you cannot have a general ledger if you do not have a bank account. Rad testified that a bank statement (JE 163) showed an account for Lenders beginning on September 25, 2008.

Rad testified that the balance sheet for Lenders lists the individual lenders by whether they were brought to the project by Merle Harris, Burns, and by Nourafchan and Rad.[28] He testified that he does not know what information was conveyed to Barry Briskin, Edith Briskin, Jeffrey Novick, or the Shirley K. Schlafer Foundation, who are listed as part of the Merle Harris Group of lenders. Rad acknowl-

edged a check from the Shirley K. Schlafer Foundation in the amount of $100,000, dated August 2, 2005, payable to St. Rose (JE 454), having a memo line stating "investment." He testified that he does not know what information was conveyed to Ms. Schlafer to write investment on the memo line. Rad acknowledged a check from Marvin Novick in the amount of $200,000, dated August 1, 2005, payable to St. Rose (JE 469), having a memo line stating "investment for Jeffrey Novick." He acknowledged a check from Edith Briskin in the amount of $100,000, dated August 2, 2005, payable to St. Rose (JE 470), having a memo line stating "investment." Rad acknowledged a check from Barry Briskin in the amount of $100,000, dated August 3, 2005, payable to St. Rose (JE 470), having a memo line stating "investment." He confirmed that all of these individuals were part of the Merle Harris Group of lenders.

Rad testified that a bank statement for St. Rose for the month of January 2008 (JE 429) includes copies of monthly interest payment checks to individual lenders that he signed. He testified that the checks were on behalf of Lenders even though the memo lines do not say so. Rad testified that he instructed someone to change the memo lines to reflect that the payments were on behalf of Lenders. He testified that he signed the checks anyway because Lenders did not have a bank account.

Rad testified that a letter dated June 4, 2007, on Investment Group letterhead, was sent to all individual lenders. (JE 159). He acknowledged that the letter to all individual lenders requests an extension of the loans and that the letter does not include any reference to Lenders. Rad

**28.** The lenders appear under the headings Merle Harris Group, R & S Group (referring to Nourafchan and Rad) and the "Second Group," which Rad testified as being a reference to lenders brought in by Burns.

also testified that a letter dated September 15, 2006, on Investment Group letterhead, was sent to Murdock. (JE 266). He acknowledged that similar letters were sent to all other individual lenders requesting an extension of their loans and that the letter is signed by Nourafchan on behalf of St. Rose. Rad testified that a letter dated November 21, 2006, on Investment Group letterhead, was sent to Merle Harris. (JE 360). He acknowledged that the reference line denotes St. Rose, 'but it also mentions the promissory note that in fact was issued by Lenders. Rad testified that a letter dated January 16, 2007, on Investment Group letterhead, was sent to Merle Harris. (JE 362). He acknowledged that the reference line denotes St. Rose, but the letter does not include any mention of Lenders. Rad acknowledged that there were no tax returns prepared for Lenders prior to July 2008 and that there was no general ledger he had ever seen before September 2008.

Rad testified that a letter dated September 24, 2008, on Investment Group letterhead, was sent to all individual lenders. (JE 334). That letter indicates that Centex did not exercise its option to purchase the Property and terminated the option agreement in August 2006. It also states that as of September 1, 2008, interest in the amount of $6,081,492.00 had been paid by St. Rose to Lenders on the $12 million loan. Rad acknowledged that the reference line in that letter refers to Lenders as well as St. Rose, and the body of the letter discusses a modification of the term of the loans to Lenders. He testified that he has no recollection of any recipients of the letter telling him that they thought they were lending money to a different entity. Rad testified that a letter dated October 10, 2008, on Lenders letterhead, was sent to all individual lenders. (JE 299). He testified that he has no recollection of any recipients of the letter telling him that they were unaware their loans were to Lenders. Rad testified that letterhead from Lenders was used because he had gotten more serious with Cargill about doing things correctly, such as opening a Lenders' account and using Lenders' stationery. Rad testified that he had asked Cargill to make those changes many times in the past, including telling her to stop using St. Rose checks to make monthly interest payments to individual lenders. He testified that he still signed the St. Rose checks prepared by Cargill and did not write in the check memo lines that the checks were on behalf of Lenders.

Rad testified that a letter dated October 20, 2009, on Lenders letterhead, was sent to all individual lenders. (JE 343). He testified that the letter provided individual lenders a warning of the consequences of a foreclosure by Colonial Bank. He testified that he has no recollection of any recipients of the letter, other than Murdock, Keach and perhaps George Nyman, telling him that they thought they were lending money to a different entity.

Rad testified that tax returns were prepared for Lenders for the 2005, 2006, 2007, and 2008 tax years (JE 593)[29] and that he would have signed them. He testified that the 2008 tax return (JE 204) was filed on an extension and acknowledged that the return was prepared by the accountants on March 8, 2010, but does not know when it was filed. Rad testified that the 2006 tax return (JE 206) prepared by the accountants on August 27, 2009 does not reflect any income or expenses for Lenders' operation, not even interest expenses. He testified that the 2005 tax return (JE 207) was prepared on August 27, 2009, and also shows no income or losses. Rad acknowl-

29. JE 593 appears to include only part of the . 2006 tax return for Lenders.

edged that the 2005, 2006, and 2007 returns include no entries for interest deductions. He testified that a tax return was prepared for Lenders for the 2009 tax year (JE 185) and he believes it was filed.

Rad testified that he exchanged emails with Marvin Burns between September 24, 2012 and October 1, 2012. (JE 689). He acknowledged that he had been seeking contributions from individual lenders to pay legal fees for the St. Rose and Lenders bankruptcy proceedings.

### 5. *Bradley Burns*

Burns is a division president of D.R Horton, a national home builder, and oversees its operations in Las Vegas. From 1999 to March 2005, Burns was a division president of Centex Homes, and then a regional executive vice president of Centex from March 2005 through July 2006.

Burns met Nourafchan and Rad in 1993 and maintained a business relationship through 2005. That relationship consisted of purchasing land both from and with Nourafchan and Rad. Purchases with them consisted of investments through single-purpose entities that Burns controlled, and used in the formation of limited partnerships or joint ventures. Burns testified that from 1993 through 2005, he invested in or had a membership interest in five different entities along with Nourafchan and Rad.

Burns testified that in the Spring or Summer of 2005, he approached Nourafchan and Rad regarding a land-bank transaction for the Property. That transaction would result in the acquisition of the Property and Centex having an option to purchase the property from the acquiring entity. Burns testified that Nourafchan and Rad "syndicated" similar deals through various investors. Additional acquisition funds would be raised through Burns and his acquaintances, such as his former good friend, Murdock. Burns testified that

Merle Harris, who had done other deals with Nourafchan and Rad, also would bring in a group of investors.

Burns acknowledged that on August 16, 2005, he transmitted an email to Murdock (JE 166) regarding the Property. Burns testified that the email referred to raising funds to acquire a second deed of trust against the Property, with Colonial Bank obtaining a first deed of trust for a loan representing 65 percent of the value of the property. He also testified that Centex was to provide a nonrefundable deposit of $8 million, and St. Rose was to acquire the Property. Burns also testified that the intention, not expressed in the email, was that Lenders would be formed to loan money to St. Rose to acquire the Property and then to receive a second deed of trust because each individual investor could not record separate deeds against the same property. He testified that he believed such an intention was conveyed to all investors, but was not sure when. Burns also testified that the enticement for investors was the opportunity to develop the property or to sell it to Centex a year later for $54 million.

Burns testified that he did not know what entity that the investors, including Murdock, sent their checks to or wired funds. Burns testified that he or his entities, including his family trust and an entity known as Double E, made checks out to either St. Rose or Lenders. He also testified that he received IRS Form 1099s each year, but was not sure whether they came from St. Rose or Lenders, because his wife was dealing with the family tax returns.

Burns further testified that Double E received a promissory note in the amount of $475,000 from Lenders (JE 86) reflecting his loan to Lenders. He also testified that he received another promissory note in the amount of $100,000 payable from

Lenders to Double E. (JE 85). He acknowledged some confusion in the names of the entities, but testified to his understanding that he was lending funds to Lenders rather than St. Rose. Based on his experience in the home building and sales industry, Burns did not believe it to be unusual that his checks occasionally were written to St. Rose rather than Lenders.

### 6. *R. Phillip Nourafchan*

Nourafchan has worked in the real estate industry since 1979. He is the managing member of RPN, which is the managing member of St. Rose, as well as one of two managing members of Lenders. Nourafchan testified that RPN also is a managing member of Investment Group.

Nourafchan testified that he has been a partner for several years with Rad on a number of projects where Rad is responsible for all of the financial aspects. He testified that the current project is a land bank venture where Centex had a one-year option to buy the Property for $54 million. Centex put up an $8 million deposit while additional funds to purchase the property were obtained from individual lenders. Nourafchan testified that separate groups of lenders were brought in by Rad, Burns and Merle Harris, while he brought in his son, Romyar Nourafchan ("Romyar"), as well as his daughter, Poopak Nourafchan ("Poopak").

Nourafchan testified that his family trust, R. Phillip and Afagh Nourafchan Family Trust, received a promissory note from Lenders dated June 7, 2007, in the amount of $140,000. (JE 98). He testified that a check in the same amount as the note was issued by the family trust payable to St. Rose on June 7, 2007. (JE 394). Nourafchan testified that the family trust received a separate promissory note from Lenders dated June 19, 2007, in the amount of $90,000. (JE 99). He testified

that a check in the same amount as the latter note was issued by the family trust payable to St. Rose on June 19, 2007. (JE 393). Nourafchan testified that while neither one of the checks refers to Lenders, the loans were made only to Lenders.

Nourafchan testified that his daughter, Poopak, decided to loan funds, and provided a check in the amount of $100,000 payable to St. Rose on or about August 21, 2005. (JE 478). Nourafchan testified that he believes both of his children knew they were making loans to Lenders, rather than St. Rose. He testified that at the time the opportunity was presented to Poopak, she was not in any position to distinguish between St. Rose and Lenders.

### 7. *Marvin Burns*

Marvin Burns ("Marvin") is a California attorney and the father of Brad Burns. He has experience in drafting loan documents, promissory notes, deeds of trust, and security documents. Marvin previously represented Rad as his attorney. Marvin had been introduced to Rad by his son, and Rad then introduced Marvin to Nourafchan.

Marvin's pension plan loaned funds to the project. Marvin testified that he did no due diligence, did not review financial information, and did not have any connections with any of the companies involved in the transaction. He received a promissory note from Lenders (JES 28 and 328), did not know if Lenders had the ability to repay the loan, and thought he would be paid back when the Property was purchased by Centex.

Marvin testified that he did not know of the existence of Lenders at the time he made the loan, but he did not believe that he was lending funds to two entities. He trusted his son, as well as Nourafchan and Rad, and was informed that St. Rose would be taking out a bank loan secured

by a first deed of trust against the Property. Marvin testified that he received written instructions from Nourafchan on Investment Group letterhead (JE 330) to wire transfer $100,000 to St. Rose.

He testified that after he received the promissory note, his pension fund began receiving monthly interest payment checks from St. Rose. (JE 333). Marvin testified that he paid attention to the amount of the checks, but not to the issuer of the checks. In the years the pension received interest payments, it received 1099s from St. Rose, but Marvin did not pay much attention. After the pension stopped receiving payments, it took no efforts to collect on the note before Lenders filed for bankruptcy protection. Marvin does not recall whether he refrained from pursuing collection because of a possible foreclosure of the Property.

Marvin recalled writing a letter to various parties dated October 12, 2012 (JE 355) attempting to raise funds to cover legal fees for various appeals arising in the Lenders and St. Rose bankruptcy proceedings.

### 8. *Ramin Zomorodi*

Ramin Zomorodi ("Zomorodi") is Rad's brother-in-law, and the president of a real estate investment firm known as Zomco, Inc. ("Zomco"). Zomco has invested in as many as ten different real estate projects with Nourafchan and Rad. Zomorodi testified that all of the other dealings had been successful. He testified that one of his main reasons for making an investment is that he trusts his other investors. He also takes into consideration the value of the property and the loan-to-value ratio. As to the current project, Zomorodi testified that he was interested in making a loan in order to receive monthly income, rather than having an equity position.

In 2005 and 2006, Zomco loaned money to the project by dealing with Rad and with a person named Teresa Cargill. Zomorodi drove by the project and reviewed the site on Google maps and Google earth. He also considered the involvement of Colonial Bank and Centex. Although he did not see an appraisal, he believed the purchase option held by Centex provided a more accurate estimate of the Property's value. Zomorodi testified that he kept up with the Las Vegas real estate market but did not look at any financial information regarding St. Rose or Lenders.

Zomco filed a proof of claim in the Lenders bankruptcy proceeding to which is attached copies of various promissory notes issued by Lenders. (JE 306). That proof of claim was prepared on behalf of Zomco by Cargill. Zomco made four loans in connection with the project. In September 2005, after the Property was acquired by St. Rose, Zomorodi signed a $500,000 check (JE 156) where Rad filled in the name of the payee. Zomorodi testified that he signed other checks where Rad filled in the payee's name. He received a promissory note for the $500,000 loan, the proceeds of which he understood would be used by St. Rose for the project.

Zomorodi testified that before Zomco loaned the funds in September 2005, he understood that one entity would own the Property and another entity would be established to make loans. In November 2005, he received a letter (JE 567) presenting an opportunity to invest an additional $150,000 into the project. Zomorodi testified that he wrote another check for $150,000 (JE 568) payable to St. Rose rather than Lenders after being instructed to do so by Cargill. The check was deposited in a St. Rose account maintained at Colonial Bank.

Zomorodi testified that he made another loan of $200,000 through a Zomco check made out to St. Rose (JE 487), for which

he received a separate promissory note from Lenders. (JE 306). He made a further loan in the amount of $250,000 for which Zomco received a promissory note from Lenders. (JE 306). As to the latter, Zomorodi had received written instructions (JE 307) to wire the funds directly to St. Rose. He testified that he knew the proceeds of his loans to Lenders were needed by St. Rose right away based on what he had been told by Cargill. So he either sent the checks directly to St. Rose by Federal Express or by wire transfer.

Zomorodi testified that Zomco received interest payments, one of which was through a check from St. Rose rather than Lenders. (JE 310). A ledger prepared by Zomco's accountant (JE 311) showed that Zomco received over $300,000 in interest payments, but none were received from Lenders. Zomorodi testified that Zomco provided $2,000 to Lenders for attorney's fees in connection with the bankruptcy proceedings. He also testified that Zomco received a 1099–INT from St. Rose (JE 308) rather than Lenders, which did not concern Zomorodi because Zomco was receiving payments. Zomorodi did, however, request and receive a copy of the Lenders operating agreement. (JE 2). Zomorodi testified that he never requested a copy of the St. Rose operating agreement because Zomco never had any association with that entity.

After Zomco stopped receiving interest payments, Zomorodi testified that he made a demand on Rad for Lenders to make payments and even considered suing Lenders to force Lenders to foreclose on the deed of trust. He held off doing so because he understood that Nourafchan and Rad were in negotiations with Burns. Zomorodi also testified that he was approached by Murdock and Keach to join in their lawsuit, but decided not to do so. He is aware that Lenders did, in fact, start foreclosure proceedings.

### 9. Poopak Nourafchan

Poopak is a California lawyer and the daughter of Phillip Nourafchan. She previously had done a successful real estate investment with her father through an entity known as R & S Alexander. Her father approached her about making a loan to the project. Based on her prior experience, she was comfortable in making the loan. Additionally, she understood that Colonial Bank already had made an acquisition loan for the Property. She testified that she also knew that Centex had an option to purchase the Property, but did not obtain financial information regarding St. Rose or Lenders.

Poopak made one loan in the amount of $100,000 through a check with the payee listed as St. Rose. (JE 478). She wrote another check dated August 21, 2005, for $100,000 payable to St. Rose. (JE 479). Neither check referred to Lenders, but Poopak testified that, at the time she wrote the checks, her father informed her there was some urgency in getting funds to the entity that was going to provide the loan to St. Rose. She testified that at the time she signed both checks in 2005, she was not aware that there were two different entities, but probably became aware shortly thereafter. Poopak testified that she probably first learned about Lenders when she received her promissory note.[30]

30. Poopak received a promissory note in the amount of $100,000 from Lenders dated September 1, 2005 (JES 12 and 395) and a separate promissory note in the amount of $100,000 from Lenders dated May 1, 2006. (JES 62 and 395). Poopak's testimony that she wrote two checks in 2005 to St. Rose appears to be in error. The date of one of the checks (JE 478) is illegible and have been written in connection with the promissory note dated May 1, 2006.

Poopak testified that she received interest checks, at least one of which was from St. Rose. (JE 408). She testified that the interest payments were consistent with the promissory note she received from Lenders. Poopak testified that she received 1099–INTs for the interest she received on her loans. She acknowledged that one of the 1099s (JE 341) showed St. Rose as the payor, rather than Lenders. She also testified that at the time she made the loans in 2005, she understood that there would be a deed of trust against the Property in Lenders' name to protect the individuals who loaned funds for the project.

### 10. *Sassan Ohebsion*

Sassan Ohebsion ("Sassan") is the son of Yehuda Ohebsion ("Yehuda"), who is the second cousin of Rad. Yehuda had previous real estate investment transactions with Nourafchan and Rad that were successful. Yehuda filed a proof of claim in the Lenders bankruptcy proceeding. Yehuda made loans for the project in 2005 and 2006, and Sassan was given sole authority by his father to administer his affairs with respect to the loans. Sassan testified that he dealt mainly with Rad or Cargill. He knows Nourafchan, but did not interact with him.

Sassan testified that on August 17, 2005, the sum of $400,000 was wire transferred (JE 426), and on August 23, 2005, another $300,000 was wire transferred to the St. Rose account. A promissory note dated September 1, 2005 (JE 17) was received from Lenders. Based on conversations with Rad, he understood that there would be one entity to own the Property and a separate entity to make loans in connection with the Property. Sassan testified that he understood the separate entity would hold a deed of trust against the Property and that his father would not hold a deed of trust individually. He understood that there was a large home de-veloper that had an option to acquire the Property within one year.

Sassan testified that subsequent loans were made by Yehuda based on discussions Sassan had with Rad. He did not review financial statements from Lenders, but believed the value of the Property was sufficient to repay Colonial Bank and Lenders.

Sassan testified that on April 20, 2006, he wrote another check (JE 474) payable to St. Rose, with the check memo line stating that it was for a loan by Yehuda to St. Rose. A promissory note dated May 1, 2006, was received from Lenders. He testified that he already knew there was a separate St. Rose entity and a separate Lenders entity.

Sassan testified that on July 30, 2006, he wrote another check in the amount of $100,000 payable to St. Rose (JE 473), for which his father received a promissory note from Lenders dated August 1, 2006. (JE 691).

Sassan also testified that on October 8, 2006, the amount of $100,000 was wire transferred to St. Rose (JE 408) for which his father received a promissory note from Lenders dated October 10, 2006. (JE 76). He testified that all of the checks and wire transfers were directed to the entity he was instructed to send them to.

Sassan testified that Yehuda always received timely interest payments for loans to other R & S entities. He received several 1099–INTs in connection with the loans to the project (JE 368) which showed St. Rose as the payor rather than Lenders. Sassan believed that he was concerned only that his father was receiving the correct amount of interest payments.

Sassan testified that he has never made a demand for payment from St. Rose because he does not believe his father has any legal rights against St. Rose. He did

receive a copy of the Lenders operating agreement but not St. Rose. Sassan testified that he considered taking legal action against Lenders but not St. Rose. He testified that he relied on the protection of the deed of trust held by Lenders and not on St. Rose in making the loans.

## B. *Video Deposition Testimony*

Counsel agreed that the following witnesses were unavailable to testify at the evidentiary hearing and that excerpts of their video deposition testimony could be admitted into the record.

### 1. *Merle Harris* [31]

Merle Harris ("Merle") is an 86–year old college graduate who lives in Detroit, Michigan, and who has been involved in approximately 15 real estate investments since 1989. He was involved in a similar number of real estate investments prior to that date. He does not know the value of the investments.

Merle testified that he knows both Nourafchan and Rad, but is more familiar with Rad. He met Rad through Burns approximately ten or fifteen years ago. He testified that he has done approximately three real estate investments with Rad. He became aware of the opportunity regarding the project through Burns. Merle testified that he trusted Burns and did not review any financial information or perform any due diligence. He did not recall any separate conversations with Rad. Merle does not know whether any other persons he brought into the transaction ever did their own due diligence.

Merle testified that he received a promissory note from Lenders in the amount of $300,000, dated September 1, 2005. (JE 351). He recognized his signature on a check in the same amount written to St. Rose (JE 354) but did not recall why it

was written to St. Rose. Merle testified that he does not recall ever thinking about whether the funds were received by St. Rose or Lenders, or whether St. Rose and Lenders were the same entity. He recalled receiving a letter dated August 31, 2005 (JE 171), that was on Investment Group letterhead. Merle testified that it was a cover letter for the Lenders' promissory note, and it did not concern him that the promissory note was being sent by Investment Group rather than Lenders, nor that St. Rose would be sending him another package.

Merle also testified that he recognized his signature on a check dated November 15, 2006, in the amount of $100,000, payable to St. Rose. (JE 355). He testified that he assumed the $100,000 promissory note from Lenders (JE 352) was in exchange for the check to St. Rose, but does not know. Merle testified that he does not recall what he was thinking or not thinking back in 2006 when he wrote the check. He testified that he received a letter dated November 21, 2006, on Investment Group letterhead, transmitting the promissory note. He testified that he did not notice that the letter referred to a loan to St. Rose rather than a loan to Lenders. Merle did not know whether the funds would be deposited into an account for Lenders or St. Rose and was not concerned.

Merle testified that he recognized his wife's signature on a $200,000 check payable to St. Rose. (JE 356). He does not know why it was written to St. Rose instead of Lenders and did not discuss it with his wife.

Merle testified that he received 1099s for the period 2005 through 2008 (JE 357) and does not know why the payer was identified as St. Rose rather than Lenders.

---

**31.** This deposition was taken on September 18, 2014.

He testified that he never thought about it and gave the 1099s to his accountants. Merle never discussed them and never objected.

Merle testified that he has no recollection of discussing with Rad, or anyone else, any distinction between St. Rose and Lenders, or, of relying on any such distinction.[32]

Merle testified that his signature appears on a general power of attorney giving his son Steven Harris ("Steven") a power of attorney over the Merle Harris Trust, but did not recall signing it. A copy of that document was attached to the proof of claim filed in the Lenders proceeding. (JE 350). He identified a variety of names and entities appearing on an attachment to the proof of claim.

Merle testified that his signature appears on a proof of claim filed on behalf of the Shirley Harris Trust (JE 353) of which he is a trustee.

## 2. Steven Harris [33]

Steven is Merle's son and a semi-retired attorney. He has been involved in around a dozen real estate investment transactions. Merle introduced him to Nourafchan and Rad, and he has been involved in two or three investments with them. Steven testified that his father approached him with information about the current project.

Steven testified that he spoke to his father about the project and probably reviewed some information that his father faxed to him. He understood that a group of individual lenders would be behind a bank, but did not pay attention as to whether St. Rose or Lenders owned the Property. Steven testified that he had no knowledge of when the entities were formed and had no discussions with Nourafchan, Rad or Merle as to any distinctions between the two entities prior to the litigation commencing. Other than reviewing the materials from his father, Steven testified that he performed no other due diligence.

Steven testified that he wrote a check payable to St. Rose dated November 8, 2006 (JE 342) [34] because that was the entity he thought he was investing in. He does not know when he received a promissory note (JE 342), and does not think he was surprised that the note was from Lenders rather than St. Rose. Steven testified that he received another promissory note dated December 1, 2006 (JE 342), and does not recall why he made an additional loan, but does recall that he did not conduct any due diligence in making the additional loan. He recalls receiving

**32.** The excerpt of Merle's video deposition does not contain any discussion of the check dated July 25, 2005, received from Jeffrey A. Harris. (JE 456). Jeffrey Harris was listed in the Lenders' balance sheet (JE 162) as part of the group of lenders brought into the project by Merle. As the check predates the filing of the articles of organization for Lenders on August 2, 2005, it is not clear what Merle could have told Jeffrey Harris about the existence of Lenders. Given Merle's testimony that he learned of the project through Burns and that he does not recall any discussions with Rad, any information passed on by Merle presumably came from Burns. No testimony from Jeffrey Harris was provided at the hearing, either live or through deposition,

and no evidence exists as to his knowledge of Lenders or any other party who would be loaning funds to St. Rose for the purchase of the Property.

**33.** This deposition was taken on September 15, 2014.

**34.** JE 342 apparently consists of copies of a variety of documents produced by the witness, including copies of checks made payable to St. Rose dated July 27, 2005, November 8, 2006, and November 15, 2006, and promissory notes from Lenders dated September 1, 2005, and December 1, 2006.

various tax documents from St. Rose (JE 342) and does not know if he received any interest checks from Lenders.

Steven testified that he received a cover letter dated August 31, 2005, on stationery from Investment Group (JE 346) that accompanied the $150,000 promissory note from Lenders dated September 1, 2005. He received another cover letter dated November 21, 2006, on stationery from Investment Group (JE 345) that accompanied the $100,000 promissory note from Lenders dated December 1, 2006. Steven testified that he does not know why separate stationery would be printed for all of the various projects. He understood that the bank would be paid prior to Steven being repaid.

Steven testified that he filed an unsecured proof of claim in the Lenders bankruptcy. (JE 342). He understood that the Property either would be sold, or it would be developed or refinanced and then he would be paid back. Steven testified that he was not paying attention to whether Lenders had a deed of trust against the Property, but that he understood that there would be some form of deed of trust in favor in favor of the individual lenders in some manner. He acknowledged providing money for attorney's fees for the Lenders bankruptcy through a fund organized by Marvin Burns.

### 3. *Romyar Nourafchan* [35]

Romyar is the son of Phillip Nourafchan. He has been a licensed real estate broker in California since 1990. He works as a mortgage loan officer at HSBC Bank in Los Angeles. Romyar testified that he is familiar with residential mortgages but not commercial mortgages. He has been involved in five or six syndicated real estate investments where a group of investors pool their funds for a project. In one of those projects, he served as the manager of a limited liability company.

Romyar testified that his father told him about the opportunity with Lenders. He does not recall how many times he spoke to his father or the substance of the conversations. Romyar does not recall reviewing any financial information or discussing a deed of trust. He recalls knowing from the beginning that St. Rose was separate from Lenders, but does not recall why. He recalls that he would be paid interest and would get his funds back when Lenders got paid off. Romyar testified that he knew Lenders would receive a note and deed of trust from St. Rose. He testified that he thought it was a good opportunity with a good return.

Romyar testified that a promissory note dated September 1, 2005, in the amount of $100,000 was issued by Lenders in his favor (JES 14, 320 and 396) and that he wrote a check dated August 21, 2005, in the same amount payable to St. Rose. (JES 321 and 479). He does not remember why the check was written to St. Rose rather than to Lenders. Romyar recognized a check (JE 326) payable to St. Rose that he thinks was issued in April or May 2006. He testified that he does not recall why that check also was written to St. Rose rather than Lenders, but that he was lending money to Lenders.

Romyar recognized various 1099–INTs for 2005 through 2008 (JE 323) and believed he gave them to his accountant. He does not recall discussing or objecting that the 1099–INTs were issued by St. Rose rather than Lenders.

### 4. *Majid Tabibzadeh* [36]

Majid Tabibzadeh ("Majid") is familiar with Rad through his community. He tes-

**35.** This deposition was taken on September 12, 2014.

**36.** This deposition was taken on September 11, 2014.

tified that he met Rad through a friend. He believed that Rad was an honorable and successful businessman. Majid testified that he met Rad in person in Los Angeles and had a long conversation about the Property before writing a check. He had shorter conversations with Rad thereafter.

Majid understood that a homebuilder had made a large down payment and would buy the Property later for a profit. Majid and his wife decided to invest $500,000, and they received a promissory note in that amount from Nourafchan and Rad. A copy of the promissory note is attached to a proof of claim filed in the Lenders proceeding. (JE 315). A copy of a check in the amount of $500,000, dated August 10, 2005, also is attached to the proof of claim with the payee shown as R & S Investment. Majid testified that Rad probably told him who to write the check to, and he did no investigation whether the loan could be repaid. Majid did not look at any bank account statements, and it did not matter to him who the entity was on the check. Other than the promissory note from Nourafchan and Rad, he testified that there are no separate promissory notes from any of the R & S entities.

Majid testified that he understood he was lending money to Lenders to do the project based on what he had been told by Rad. He testified that he also wanted the borrowers to have a moral obligation to repay him in addition to being paid by the project. Majid testified that the proof of claim was filled out for him, and he signed it. He did nothing to review the accuracy of the information or to determine if it was proper to file the proof of claim in Lenders' bankruptcy.

Majid testified that he received interest payments from St. Rose and 1099–INTs

that came from St. Rose (JE 317), but just deposited the checks without looking who they came from.

### 5. *George Nyman* [37]

George Nyman ("Nyman") is a real estate investor and majority shareholder of a real estate management company. The company manages fifteen or twenty commercial and residential properties consisting of apartments, houses and home parks. He testified that the value of the properties exceeds $500 million.

Nyman testified that he received a promissory note dated September 1, 2005, in the amount of $300,000 payable by Lenders. (JE 364). He does not recall making any distinction between Lenders and St. Rose. He believes that a bank account statement from Colonial Bank accurately reflects a wire transfer deposit of $300,000 that took place on August 10, 2005.

Nyman had been contacted verbally about the project by Merle, but does not recall any discussions, any documentation, or performing any due diligence. Nyman testified that he does not recall ever meeting Rad and does not recall discussions of business plans or projections. He testified that he made the investment based only on his relationship with Merle.

Nyman testified that he recognizes various 1099–INTs from 2005 through 2008 (JE 368) but does not recall ever noticing or discussing that the payer was St. Rose rather than Lenders.

Nyman testified that a proof of claim was filed in the Lenders bankruptcy on July 18, 2011, in the amount of $300,000. (JE 369). He testified that an amended proof of claim was filed in the Lenders bankruptcy on August 3, 2011, in the amount of $538,219.18. (JE 370). He tes-

**37.** This deposition was taken on September 19, 2014.

tified that a proof of claim was filed in the St. Rose bankruptcy on August 3, 2011, in the amount of $538,219.18. (JE 371). Nyman testified that a copy of an amended complaint filed in his lawsuit against Lenders, St. Rose, Rad, Nourafchan, and others, was attached to each proof of claim. He testified that he could not independently state why amended proofs of claim or separate proofs of claim were filed in the two bankruptcy proceedings.

Nyman testified that he does not recall why he received a copy of the Lenders Operating Agreement. (JE 2). He testified that he did not pay attention to what entity was sending him interest checks.

Nyman testified that he faxed a letter to Nourafchan dated October 25, 2006 (JE 373) addressed to St. Rose, but did not know why it was addressed to St. Rose. He testified that he sent another letter dated October 27, 2006 (JE 374) that referred to Burns. Nyman testified that he has no recollection of any discussions of Burns' involvement in the project.[38]

Nyman testified that he has no recollection of a letter from Rad dated November 5, 2008 (JE 377) regarding an inability to return his funds nor does he recall having any conversations with Rad.

Nyman testified that he no longer gets along with Burns and they no longer speak.

**38.** Nyman's video deposition excerpt does not include an examination with respect to JES 174 and 374, which appear to indicate that on October 27, 2006, he agreed to an extension of the maturity date of his promissory note as long as Burns took control of the project and was staying in the deal.

**39.** This deposition was taken on February 1, 2012. Rad testified at the evidentiary hearing on October 27 and October 28, 2014. Rad attributed a variety of actions to Cargill, but apparently none of those actions were addressed during Cargill's deposition conducted more than thirty months earlier. Counsel

## C. *Deposition Testimony Read Into the Record*

Counsel agreed that the following witnesses were unavailable to testify at the evidentiary hearing and that excerpts of the transcripts of their prior deposition testimony could be read into the record.

### 1. *Teresa Cargill* [39]

Cargill has been employed by Investment Group since May 2, 2005, as its office manager and bookkeeper. She testified that she sent emails, wrote checks, made deposits, arranged wire transfers, kept a general ledger, prepared promissory notes, and prepared proofs of claim. In addition to Investment Group, she provides such services to the other R & S entities, including St. Rose and Lenders. She is paid only by Investment Group and does not keep track of the time she spends on projects for the other entities. Cargill used QuickBooks for all of the entities. She received instructions from Rad or Nourafchan. Cargill testified that Rebecca Daniels ("Daniels"), a certificate public accountant, worked part-time, starting maybe in 2007.

Cargill testified that every R & S entity had its own company "set up," except for Lenders, which was not set up in the very beginning. She testified that she believes Lenders was set up in 2009.[40] Cargill

designated only certain portions of Cargill's deposition testimony prior to the evidentiary hearing and did not seek to supplement those designations after Rad testified.

**40.** It is not clear to the court what Cargill meant about being "set up." If she was referring to Lenders being formed, it appears she was aware of Lenders' formation in August 2005 because she sent transmittal letters to individual lenders with their promissory notes stating that the Lenders Operating Agreement would be sent in a separate package. If she was referring to opening bank accounts, establishing a separate entity in QuickBooks,

testified that Lenders did not have its own email account and did not have formal letterhead.

Cargill testified that a document called a "transactions by account" for Investment Group (JE 425) had been created through QuickBooks on January 11, 2012. She testified that the document showed a running balance of amounts owed by St. Rose to Investment Group through August 27, 2008. Cargill testified that an interest reserve for the Colonial Bank loan had been drawn down enough to require St. Rose to borrow $400,000 from Investment Group in January 2007 to make the interest payments on that loan as well as to make interest payments to private lenders. She testified that by August 2008, there was no interest reserve at all for the Colonial Bank loan. Cargill testified that she does not recall receiving an explanation or having a discussion with Rad regarding transfer of funds to Lenders on September 2, 2008 as indicated in the transactions by account. She testified that she was not involved in the reclassification entry and that it was done by Daniels. She does not recall Daniels explaining why the reclassification entry was made. She testified that an entry for September 1, 2009 by Daniels reflects a $500,000 deposit from an individual lender directly into St. Rose back in 2005 because Rad had personally guarantied the loan. Cargill testified that Rad personally guarantied repayment of

another loan in the amount of $155,000 from Nahid Kermanian that was deposited directly to St. Rose.[41]

Cargill testified that she used a program to generate 1099–INT forms based on reports generated by QuickBooks. The amounts were based on interest that St. Rose had paid at the instruction of Rad. Cargill testified that she was instructed by Daniels to generate the 1099s for the years 2005, 2006, 2007, and 2008. She testified that Rad probably reviewed the 1099s before they were sent and that he was aware that the 1099s showed interest payments by St. Rose.[42] Cargill reviewed 1099–INTs and 1099–MISCs issued by St. Rose for 2010 (JE 417), 2009 (JE 418), 2008 (JES 419 and 420), 2007 (JE 421), 2006 (JE 422), and 2005 (JE 423), and testified that there were no interest payments made by Lenders at any point in time. She testified that she never received any objections from any of the recipients of the 1099s. Cargill also testified that there were no interest payments to any individual lenders by anyone after the 2008 calendar year. Cargill testified that St. Rose never issued a 1099–INT to Lenders because St. Rose never actually paid interest to Lenders.[43] Cargill testified that a 1099–INT form for the 2005 tax year (JE 423) showed that St. Rose paid $117,570.79 in interest to Investment Group on a calendar year basis.

---

and creating a separate email account, then she might have been referring to the subject of her later testimony.

**41.** The transactions by account document includes only one entry in the amount of $155,000 on October 19, 2007, with the memo "to record Ke…" It is not clear to the court whether that memo refers to the first two letters of the name Kermanian. During the reading of the Cargill deposition, counsel for BB & T referred to a corresponding check admitted as Ex. 519, but that check

is dated June 6, 2006, and makes no reference to a person having the first name "Nahid."

**42.** The court overruled an objection based on lack of foundation for this part of Cargill's testimony.

**43.** This appears to directly contradict the representations in the letter dated September 24, 2008, that St. Rose had paid $6,081,492.00 in interest to Lenders as of September 1, 2008. (JE 334).

Cargill testified that at the beginning of the project, Rad gave her a template to prepare promissory notes for the different loans to St. Rose. She testified that she prepared the promissory notes within days after each check was deposited and that the dates of the promissory notes were based on the date of the deposits. Cargill testified that one of those promissory notes in the amount of $400,000 payable to Investment Group dated September 1, 2005 (JE 13), appears as two August 24, 2005 entries on the transaction by account document for Investment Group because the two checks totaling $400,000 were not deposited until September 1, 2005. She testified that she does not know why two checks were written. Cargill testified that as soon as she prepared the promissory notes, she would give them to Rad and Nourafchan to sign. Promissory notes in favor of Investment Group would go into their files, while promissory notes for other parties would be sent out.

Cargill testified that the $400,000 promissory note to Investment Group (JE 13) included a Provision 6 that referred to security documents. She testified that the security documents provision was part of the promissory note template provided by Rad and that she never asked anyone what those documents were.

Cargill testified that no interest payments were made after 2008 because there was no money available. She testified that the reclassification took place in September 2008, right about the time the money ran out. Cargill testified that Lenders did not have a bank account at that time and that Lenders never made an interest payment to Investment Group or any individual lenders at any point in time. She does not recall writing any interest checks on any Lenders account, and only Rad and Nourafchan had authority to sign checks on the St. Rose account.

Cargill testified that the QuickBooks account for Lenders came into existence some time in September 2008. She does not recall any 1099s being issued by Lenders for the 2008 tax year. She testified that there was no money paid by Lenders for interest in 2008. Cargill testified that she does not know why a QuickBooks account had not been opened despite the issuance of promissory notes in 2005 showing Lenders as the borrower.[44] She testified that Rad did not direct her not to open a QuickBooks account, and she does not believe it was Daniels' decision.

Cargill testified that she prepared, at Rad's instruction, a proof of claim in the amount of $8,439,463.49 that was filed by Investment Group in the Lenders bankruptcy as Claim No. 51.[45] She testified that she does not know the factual or legal basis for the claim stating the amount of $1,766,000 as being secured and the amount of $6,673,453.49 as being unsecured, nor does she understand the difference between a secured and an unsecured claim. Rad instructed her to insert those amounts in the proof of claim and he would have the information.

Cargill testified that she prepared the proofs of claim for the individual lenders as instructed by Rad. She does not recall how many individual lenders asked for assistance in filling out their proofs of claim.

44. Cargill was not asked why a bank account had not been opened for Lenders nor why St. Rose checks were used to make monthly interest payments from 2005 through 2008.

45. A copy of Claim No. 51 was not marked as an exhibit in connection with the hearing on the Consolidation Motion. Counsel stipulated, however, that the court could take judicial notice of Claim No. 51 and it was considered in connection with Cargill's testimony.

## 2. Rebecca Daniels [46]

Daniels is a certified public accountant licensed in Nevada. She provided bookkeeping and accounting services to Investment Group starting in October 2005. She did not start working for Investment Group until after the Property was acquired by St. Rose. Daniels relocated to Washington, D.C., in January 2011. She testified that both she and Cargill assisted Nourafchan and Rad with their various R & S entities, but that Daniels' duties were more complicated because of her training.

Daniels testified that she did not prepare tax returns but went through the entities' books at the end of each year to make them understandable for the tax accountant. As an example, she documented the interest payments to match the payers to the payees on 1099s that were issued.

Daniels testified that her primary contact was Rad. Roughly ninety-five percent of her direction was taken from Rad with the remaining five percent from Nourafchan. She testified that she also provided services to St. Rose and to Lenders, at the direction of Rad.

Daniels testified that the transactions of Investment Group with St. Rose and Lenders are reflected in a transaction by account statement dated January 11, 2012. (JE 425). Daniels testified that on September 2, 2008, the account statement reflects a reclassification of St. Rose debt to Lenders. She had spoken to Cargill about the reclassification shortly before it occurred. Daniels testified that prior to the reclassification, she understood that certain loans by Investment Group and various individual lenders were being made directly to St. Rose. Additionally, that understanding was consistent with what was reflected in all of the books and records of Investment Group and St. Rose.

Daniels testified that as far as she knew, Lenders did not exist prior to September 2, 2008, when the reclassification took place.

Daniels testified that she does not recall who made the decision to reclassify the debts but does not recall unilaterally making that decision. She thinks it was the type of decision that would have been discussed with Rad. Daniels testified that as a result of the decision, all debts owed by St. Rose to Investment Group were reclassified as being owed to Lenders, and that all debts owed by St. Rose to individual lenders were reclassified as being owed to Lenders.

Daniels did not recall any discussions about St. Rose and Lenders sharing a bank account, nor about wanting to save money on the cost of buying separate checks.

Daniels testified that a general ledger for St. Rose as of April 4, 2011 (JE 412), reflects the activity in the bank accounts of St. Rose. She testified that the ledger showed activity in St. Rose's accounts with Colonial Bank from August 8, 2005 through April 4, 2011. Daniels testified that she had final responsibility for ensuring that everything was correct in the ledger, but that the majority of the day-to-day activity was entered by Cargill. She was not aware of any ledger entries reflecting a loan of funds by Lenders to St. Rose prior to August 29, 2005.

Daniels testified that the ledger reflected that Investment Group loaned $180,000 to St. Rose on March 27, 2008, to cover monthly interest payments, but no monies were loaned by Lenders to St. Rose for any purposes. She also testified that the ledger reflected that St. Rose made monthly interest payments directly to individual investors in satisfaction of a

46. This deposition was taken on May 18, 2012.

billing entry. Daniels also testified that a monthly interest payment check could be written directly without a billing entry, but the check would be noted on the ledger along with a brief memo.

Daniels testified that she had no involvement in a proof of claim in the amount of $8,439,463.49 that was filed by Investment Group in the Lenders bankruptcy as Claim No. 51.[47] After reviewing various documents attached to that proof of claim, Daniels testified that she does not recall any dates on which she may have seen various promissory notes and that as of February 1, 2007, she did not know that Lenders existed.

Daniels testified that she was involved in creating various 1099–MISC and 1099–INT forms (JES 417–423) that reflected interest payments made by St. Rose to various individual investors.

Daniels testified that the statements attached to the federal tax returns for St. Rose for 2005 (JE 413) and 2006 (JE 414),[48] do not show amounts being owed by St. Rose to Lenders. She testified that the statement attached to the federal tax return for 2008 (JE 416) reflected that no money was owed to Lenders at the beginning of 2008, but that $19,174,898 was owed to Lenders at the end of 2008.

Daniels testified that the unsigned federal tax return for Lenders for 2005 (JE 207) reflects a signature date of August 27, 2009, but she has no knowledge whether it was signed or printed on that date.

### 3. *Shahram Rahimi* [49]

Shahram Rahimi ("Rahimi") has known Rad for over 15 years. He has a business partner whose father is a childhood friend of Rad. Rahimi does not know Nourafchan.

Rahimi testified that he has been part of five or six entities that own real estate, including three entities involving Nourafchan and Rad. He does not recall whether he learned of the project through his business partner or through Rad. Rahimi does not recall whether he visited the Property, evaluated the Property, or conducted any due diligence before making the loan. He also does not recall whether he knew that Nourafchan and Rad were raising funds through other lenders or getting a bank loan, or whether he was requested to extend the maturity date on his loan. Rahimi testified that he liked the interest rate that he would be paid back, and he made a check in the amount of $300,000, payable to R & S Investment, on August 15, 2005. (JE 289). He has no recollection why the check was payable to R & S Investment or whether he was even aware of Lenders at the time he wrote the check.

Rahimi testified that he received a promissory note in the amount of $300,000 from Lenders, dated September 1, 2005. (JE 290). He does not recall whether he had any understanding about receiving a deed of trust, nor does he recall when he first heard of Lenders or whether he was given any financial information about St. Rose or Lenders before making the loan. He does not remember whether he ever

47. A copy of Claim No. 51 was referenced during the deposition of Daniels but was not marked as an exhibit in connection with the hearing on the Consolidation Motion. At the latter hearing, counsel stipulated that the court could take judicial notice of the claim, and it was considered in connection with Daniels' testimony.

48. Because of the manner in which excerpts from the deposition transcripts were read into the record, it was not clear to the court whether Daniels testified at her deposition similarly with respect to the federal tax return for 2007. (JE 415).

49. This deposition was taken on August 20, 2014.

received any security documents that are referenced in the promissory note. Rahimi does not know why his check was payable to R & S Investment, but the note was issued by Lenders.

Rahimi testified that he was not surprised that the interest payments came from St. Rose rather than Lenders. He received 1099–INTs for 2005, 2006, 2007, and 2008 from St. Rose. (JE 291). Rahimi testified that he gave the 1099s to his accountant but does not recall giving specific instructions as to identifying the payer as Lenders on his income tax returns. He does not recall whether he received any interest payments from Lenders or whether he made any distinction between St. Rose and Lenders when he received a payment.

Rahimi testified that he received a Colonial Bank wire transfer from St. Rose in the amount of $200,000 on December 28, 2007. (JE 292). He does not know if he distinguished between St. Rose and Lenders, and cannot recall the purpose of one entity over the other.

Rahimi testified that he does not know who filed a proof of claim for him in the Lenders bankruptcy proceeding (JE 288) or whether someone filed it for him.

Rahimi testified that after payments stopped, he does not recall whether he spoke to Rad or what options were considered. He testified that even though St. Rose stopped making the payments, it was not the entity that owed repayment of the loan.

### 4. *Kayvan Setareh* [50]

Kayvan Setareh ("Setareh") got involved in buying and selling commercial real estate in the early 1990s. During his lifetime, he purchased five or six properties. Entities were formed to purchase the properties, but he is no longer a member of any of them. Setareh testified that Nourafchan and Rad were not involved in any of those entities.

Setareh was introduced to Rad by his father, Ravi Setareh, perhaps in the 1990s. He also is the nephew of David Setareh. He also knows Nourafchan as a family acquaintance. Setareh testified that his father approached him about the project. He never spoke to Nourafchan or Rad about the actual transaction. Setareh does not recall any discussions regarding the use of any loan funds, the entity that would receive the funds, or the financial information regarding the entity; all of that was being handled by his father.

Setareh testified that he does not recall when he received the promissory note from Lenders, dated May 1, 2006, in the amount of $400,000, a copy of which is attached to the proof of claim he filed in Lenders' bankruptcy proceeding. (JE 297).[51] He did not have an understanding that the note was secured by a deed of trust because he was not involved with it. Setareh does not recall seeing the name Lenders before receiving the promissory note.

Setareh testified that although the proof of claim indicates that it is a secured claim, someone else may have filled in the claim form. He also does not know that there are two different bankruptcy proceedings or why the proof of claim was filed in one case rather than another.

Setareh testified that a ledger was maintained (JE 295) showing interest payments that were received. He testified that the

---

**50.** This deposition was taken on August 21, 2014.

**51.** Attached to his proof of claim is a largely illegible copy of a check that Setareh apparently wrote in exchange for the promissory note.

ledger refers to St. Rose. Setareh also testified that various 1099–INTs for 2006, 2007, and 2008 (JE 296) shows St. Rose to be the payer.

### 5. *Vida Hamadani* [52]

Vida Hamadani ("Hamadani") testified that she loaned money to Lenders. She made a check out to St. Rose in the amount of $200,000, dated November 5, 2006 (JE 300), the memo line of which she testified made reference to a loan to Lenders. Hamadani wrote the word Lenders on a separate piece of paper. (JE 303).

Hamadani testified that she received 1099–INTs (JE 301) from St. Rose but that the interest was received from Lenders. She never asked why she was receiving the 1099s from St. Rose rather than from Lenders. Hamadani testified that she received two checks from St. Rose bearing the memo line "monthly interest" (JE 299), but believes that they were coming from Lenders. She testified that she does not agree that the checks from St. Rose do not mention Lenders.[53] Hamadani also testified that as long as she was receiving monthly interest checks, it did not matter to her who was issuing the checks. It was her understanding that she was being paid by Lenders.

Hamadani testified that she discussed the loan with her husband, and they agreed to make it because it was an agreement, and that they trusted Rad. She was comfortable making the loan because she had made a prior loan, and it had been paid back. Hamadani testified that she did nothing to determine whether Lenders was able to pay the interest she expected to receive. She did not know that St. Rose owned real property near Las Vegas, did not know of any assets of St. Rose, and had no understanding of the assets of Lenders.

Hamadani testified that she filed a proof of claim in Lenders' bankruptcy proceeding (JE 302) in the secured amount of $278,055.56. She signed the proof of claim but someone else prepared the form. Hamadani testified that she does not know what it means to have a secured interest. She testified that the copy of a $200,000 promissory note dated December 1, 2006, which was attached to the proof of claim, must be for the check she wrote on November 26, 2006. Hamadani testified that she never believed that she was getting security for the loan.

Hamadani testified that after Lenders defaulted on loan payments, she did not take any legal action.

### D. *Additional Deposition Testimony of Michael Broida* [54]

Michael Broida ("Broida") has been a certified public accountant since 1978 and is licensed in California. He testified that his firm first prepared tax returns for Lenders somewhere around 2009. Broida testified that St. Rose and Lenders are separate organizations and that he would have been provided operating agreements

---

**52.** This deposition was taken on August 21, 2014.

**53.** By refusing to acknowledge that the check copies make no mention of Lenders, Hamadani's credibility with respect to the rest of her testimony is questionable at best. Because her deposition was not conducted by video and excerpts of the written transcript were only read into the record, however, the court obviously does not know the full scope of Hamadani's testimony and the court did not have an opportunity to assess her credibility as a live witness.

**54.** This deposition was taken on April 25, 2012. Apparently, Broida was shown various exhibits during his deposition, but none of those exhibits were cross-referenced to the exhibits admitted in connection with the Consolidation Motion.

for both entities. In preparing tax returns, he testified that he would have been provided with QuickBooks printouts for both entities.

Broida does not remember whether, at the time he became the accountant for St. Rose and Lenders, any tax returns had been filed for Lenders. He testified that he does not remember asking why tax returns had not been filed prior to his firm being hired. Broida also testified that a 2007 tax return may have been prepared a year after meeting with Lenders because he may not have had the required information, and there was no income tax effect anyway.

Broida does not recall having any discussions why St. Rose was making monthly interest payments to various individuals. He does not think his firm would have issued any 1099-INTs for St. Rose. Broida testified that he does not recall being consulted about a reclassification that may appear in the 2008 tax return for St. Rose. He testified that the reclassification reflected by the 2008 tax return was recorded at that time but may not actually have occurred at that time. Broida testified that while the returns for both St. Rose and Lenders might show the same liabilities to other entities, it did not make any difference because the intermediary is Lenders. He testified that after the reclassification, there would have been no reason to file amended tax returns for St. Rose because there would be no income tax effect.

## EXHIBITS ADMITTED

In excess of 600 joint exhibits, some subject to objections, were identified by the parties. Additional exhibits were marked during the course of the evidentiary hearing. Hard copies of each joint exhibit, as well as a thumb drive containing digital copies of each exhibit, were provided to the court. Counsel stipulated to the admission of the joint exhibits with any previously noted objections to certain exhibits, in whole or in part, to be resolved during the course of the hearing, either by written decision or oral ruling.

The exhibits included copies of more than 85 separate checks written by various individual lenders. (JES 156,[55] 289, 314, 342, 356, 383–385, 390,[56] 393–394, 450–476, 478–480, 482–498, 506–510, 512–520, 522–525, 527–529, 532, and 562). The court directed counsel to identify the relevant exhibits in their closing briefs. Attached as Appendix "A" to the BB & T Closing brief is a table identifying the various checks by maker, payee, date, and joint exhibit number.

As previously discussed at note 20, Lenders specifically objected to the admission of certain pages contained in a 487-page Colonial Bank loan file encompassed by JE 596. The court overruled those objections and JE 596 was admitted into evidence.

Also admitted into evidence was JE 285, the digital copy of which consists of 1,847 pages of papers and documents produced or filed in connection with the consolidated State Court Action. Subject only to specific objections, counsel for the parties stipulated to the admission of all of the exhibits provided digitally. It appears, however, that counsel intended to only

---

**55.** This check from Zomco, Inc., is dated September 27, 2005, in the amount of $500,000, and made payable to "R & S Washburn/or R & S St. Rose Lenders." Zomorodi testified that Rad filled in the name of the payee.

**56.** One of the checks on this joint exhibit is from Double E Family LLC, Bradley F. Burns, dated November 30, 2006, in the amount of $100,000, and made payable to Lenders.

stipulate to the admission of one page consisting of correspondence dated September 11, 2006, from attorney Anthony C. Gordon to Andrew G. Miller,[57] rather than the remaining 1,846 pages included in the digital copy of JE 285.[58] The court therefore does not treat the documents regarding the State Court Action as evidence that BB & T and Commonwealth have waived any objection to consideration of the State Court's findings, even if the directive of the USDC on remand could be waived.

## APPLICABLE LEGAL STANDARDS

 Substantive consolidation is an equitable remedy that permits the "bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 764 (9th Cir.2000). The policy underlying this doctrine "is to ensure the equitable treatment of all creditors." *Id.* Although the essential purpose of the doctrine is to ensure fairness to all creditors, the doctrine must be used sparingly. *Id.* at 764 and 768; *In re Aroonsakool*, 2014 WL 1273696 at *8 (9th Cir. BAP Mar. 28, 2014).

 The impact of substantive consolidation is significant: "The consolidated assets create a single fund from which all claims against the consolidated debtors are satisfied; *duplicate and inter-company claims are extinguished*; and, the creditors of the consolidated entities are combined for purposes of voting on reorganization plans." *Bonham*, 229 F.3d at 764. (Emphasis added.). *See also In re Clark*, 525 B.R. 107, 127 (Bankr.D.Idaho 2014) ("The result of substantive consolidation is the merging or pooling of all assets and liabilities and the elimination of inter-entity claims.").

 In *Bonham*, the Ninth Circuit adopted the approach articulated by the Second Circuit in *Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515 (2nd Cir.1988). *Id.* at 766. Under this approach, the court considers two factors in determining whether substantive consolidation is appropriate: "(1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors." *Id.*, *citing Augie/Restivo*, 860 F.2d at 518.[59] "The presence of either factor is a sufficient basis to order substantive consolidation." *See Bonham*, 229 F.3d at 766.[60]

---

**57.** In that September 11, 2006, letter, attorney Gordon expresses his understanding that Centex had not exercised its option to purchase the Property from St. Rose by the September 6, 2006 deadline.

**58.** The court assumes that counsel for the parties are simply unaware that the digital copy of JE 285 that was submitted to the court included far more than the one-page letter. That letter was designated by Lenders as a possible exhibit prior to the evidentiary hearing, *see* Lenders Exhibit Designation at 24:19–20, but it does not appear that the other materials included in the exhibit were designated by any of the parties.

**59.** In this memorandum decision, these considerations will be referred to as the "Bonham Factors" even though they also could be referred to as the *Augie/Restivo* factors.

**60.** In *Bonham*, substantive consolidation was appropriate when the chapter 7 individual debtor commingled her personal assets with two shell companies in which she was sole shareholder, and in furtherance of a Ponzi scheme. 229 F.3d at 767. The scheme involved investment contracts that were interchangeably issued by the debtor and the shell companies to investors. *Id.* at 759. The debtor freely transferred income between the shell companies to satisfy prior investment

Under the first factor, the court examines whether the creditor extended credit based solely on the financial condition or status of the debtor, or whether it considered the financial condition or status of another entity related to the debtor. *See id.* This examination focuses on the expectations of the parties:

> With regard to the first factor, creditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan. Such lenders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Such expectations create significant equities. Moreover, lenders' expectations are central to the calculation of interest rates and other terms of loans, and fulfilling those expectations is therefore important to the efficiency of credit markets. Such

efficiency will be undermined by imposing substantive consolidation in circumstances in which creditors believed they were dealing with separate entities.

*Augie/Restivo,* 860 F.2d at 518–19. *See also Bonham,* 229 F.3d at 766. The burden rests on the proponent of substantive consolidation to show that the creditor relied on the financial condition or credit of a separate entity. *See Bonham,* 229 F.3d at 767. *See also* Remand Order at 6:21 to 7:5.

### THE REMAND ORDER

The USDC vacated the Consolidation Order and remanded for proceedings consistent with the Remand Order. The USDC looked to whether this court had properly considered the two Bonham Factors and concluded that this court erred. *See* Remand Order at 3:19–22.

The USDC specifically directed the bankruptcy court to do several things: (1) to give further consideration of the first Bonham Factor without reliance on or reference to the state court order, *see* Remand Order at 5:17–18,[61] (2) to determine whether BB & T and Commonwealth "met

---

contracts, and used proceeds from the shell companies for her personal finances. *Id.* The court determined that the shell companies were nothing more than that—companies with no separate financial statements or tax returns, simply used to funnel income in furtherance of the debtor's Ponzi scheme. *Id.* at 767.

**61.** The USDC concluded that this court erred in numerous respects, including its reliance on findings of fact entered by the State Court. In the Consolidation Order, this court referenced the State Court's finding "that Colonial Bank did not treat the Debtors as a single entity when the parties entered into the Construction Loan in 2007." Consolidation Order at 7:1–2. Apparently, during the appeal, neither Lenders nor St. Rose argued in favor of issue preclusion and this court's reliance on the State Court's finding therefore was rejected on appeal. *See* Remand Order at 5:8–16. The USDC concluded that this

court's error in applying issue preclusion "is of a sufficient magnitude as to vacate the bankruptcy court's decision as it concerns the first Bonham factor and to remand consideration *without* reliance on or *reference to* the state court order." Id at 5:16–18. (Emphasis added.)

Curiously, the "without ... reference to" language from the Remand Order took on an almost magical quality during the evidentiary hearing because counsel for BB & T and Commonwealth formally objected whenever counsel for Lenders, St. Rose, the Creditor Group, or Investment Group even mentioned the State Court Action or the determinations made by the State Court. *Compare* J.K. Rowling, Harry Potter and the Sorcerer's Stone (Scholastic Corp.1998) (A popular children's book where the most evil of all wizards is referred to as "He Who Must Not Be Named"). The Remand Order, however, does not require this court or the parties to deny the existence of the State Court Action. Rath-

their burden under the first Bonham factor as it concerns all creditors, not merely Colonial Bank," *see* Remand Order at 7:4–5, and (3) to give further consideration whether BB & T and Commonwealth met their burden of showing that the investors treated the debtors as a single economic unit, *see* Remand Order at 5:19–21. Taken together, these directions require this court to determine on remand whether BB & T and Commonwealth have met their burden of proving that all creditors, including Colonial Bank, treated Lenders and St. Rose as a single economic without regard to the findings and conclusions entered in the State Court Action.

The USDC upheld the bankruptcy court's conclusion that the second Bonham Factor did not warrant substantive consolidation. *See* Remand Order at 7:6–8. The USDC agreed that BB & T and Commonwealth had not shown that the affairs of Lenders and St. Rose "are so grossly entangled with one another that disentangling is either impossible or necessary to minimize the realization of net assets available to creditors." *Id.* at 7:13–16.

Finally, the USDC stated that it was "neither finding nor directing a determination that substantive consolidation is appropriate." Remand Order at 8:15–16. Instead, it left that equitable determination to the bankruptcy court. *Id.* at 8:16–17. The USDC emphasized that the "sole aim of substantive consolidation is fairness to all creditors; the equitable treatment of all creditors." *Id.* at 7:23–24.

## DISCUSSION

As directed by the USDC on remand, this court will first examine whether BB &

er, the USDC simply directed the bankruptcy court to consider the Consolidation Motion under the first Bonham Factor without adopting or relying on any of the findings and conclusions entered in the State Court Action. In other words, the doctrine of issue preclu-

T and Commonwealth have met their burden of establishing that Colonial Bank, as well as the individual lenders, dealt with Lenders and St. Rose as a single economic unit and did not rely on their separate identities in extending credit. If the first Bonham Factor is present, this court will then examine if substantive consolidation of the Lenders and St. Rose estates would result in the equitable treatment of all creditors.

### I. *Has the Burden of Proof on the First Bonham Factor Been Met?*

The parties' many arguments require this court to consider both the claims arising from the acquisition of the Property by St. Rose in 2005 and the Construction Loan granted by Colonial Bank in 2007.

### A. *The 2005 Acquisition Loan from Colonial Bank.*

Colonial Bank loaned $29,305,250.00 to St. Rose as memorialized in the Acquisition Loan Agreement effective August 16, 2005. (JES 211 and 399). The agreement is signed by Rad and Nourafchan on behalf of both Forouzan and RPN as the managers of St. Rose. In the same capacities, Rad and Nourafchan also signed a Promissory Note Secured by Deed of Trust in the same amount and on the same date. (JE 212). The note was due and payable no later than 12 months after recordation of the deed of trust, subject to a single option to extend the maturity date for an additional six months upon payment of an extension fee. Monthly interest-only payments were required. The Acquisition

sion does not apply and this court must independently adjudicate whether Colonial Bank treated Lenders and St. Rose as a single economic unit in extending the 2007 Construction Loan.

Loan Agreement provides, *inter alia*, that the loan is guaranteed by Rad and Nourafchan. A Guarantee was signed by Rad and Nourafchan effective August 16, 2005. (JE 265). An Option Agreement and Escrow Instructions also was signed by Rad and Nourafchan on August 22, 2005, granting Centex the right to purchase the Property from St. Rose for the amount of $54,102,000, no later than September 6, 2006. (JE 161). A Grant, Bargain, Sale Deed from Carina Corporation, transferring title to the Property to St. Rose, was signed on August 25, 2005, and recorded in Clark County on August 26, 2005. (JE 214). Rad and Nourafchan also signed a Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rents as of August 16, 2005, in favor of Colonial Bank under the Acquisition Loan Agreement, that was recorded in Clark County on August 26, 2005. (JES 213 and 400).[62]

Lenders received from St. Rose, a Promissory Note Secured by Deed of Trust dated August 23, 2005, in the amount of $12,000,000 ("St. Rose Note"). (JE 3). That note is signed by Rad and Nourafchan on behalf of Forouzan and RPN as managers of St. Rose. The note is due and payable at the earlier of Centex's purchase of the Property under the option agreement or August 23, 2006. In the event Centex does not complete the purchase by August 23, 2006, the note provides for an extension of time until a new purchaser is found. The St. Rose Note accrues annual interest at 13.5 percent and requires St. Rose to make monthly payments of accrued interest. In the same capacities, Rad and Nourafchan also signed a Second Short Form Deed of Trust and Assignment of Rents dated August 23, 2005, that was recorded in Clark County on September 16, 2005 ("St. Rose DOT"). (JES 4 and 401). That deed of trust specifies that it secures the payment amount of $12,000,000 under the St. Rose Note.

Lenders issued separate promissory notes in favor of numerous individual lenders based on the date that checks from individual lenders were deposited into the bank account of St. Rose. Occasionally, the promissory notes issued by Lenders were based on the date that individual lenders completed wire transfers of funds to the St. Rose account.[63] From September 1, 2005 through June 19, 2007, Lenders issued more than 75 promissory notes in favor of various individual lenders. (JES 6–12, 14–66, 68–89, 91, 93, 97–99, 121–123, 171, 290, 320, 328, 342, 345, 346, 351, 352, 364, 389, 395, 396).[64] All of the

**62.** On August 31, 2005, a letter was sent to Colonial Bank by its counsel confirming that counsel had prepared the loan documents in connection with the 2007 Loan Transaction. (JE 165). Amongst other things, counsel's letter also states that "We render no opinion with respect to the priority of any security instrument as Colonial Bank is relying on title insurance with respect thereto."

**63.** Rad testified that some individual lenders may have sent checks or transferred funds directly to escrow. If that occurred, it is not clear when promissory notes would have been issued by Lenders. The escrow closing statements issued in connection with the Acquisition Loan (JES 281, 585, 283, 282 and 586)

do not clearly identify the sources of consideration credited to complete the transaction by the August 25, 2005 closing date.

**64.** Some of the exhibits include copies of promissory notes that are duplicated in other exhibits stipulated by the parties. For example, one promissory note in the amount of $300,000 dated September 1, 2005, in favor of the Merle Harris Trust appears in three separate exhibits. (JES 34, 171, and 351). During the same period of time encompassed by those promissory notes, Lenders issued numerous additional promissory notes primarily in favor of Investment Group. (JES 5, 13, 67, 90, 92, 94–96, 100–101).

notes provide for interest to accrue until the note is paid in full and for the accrued interest to be paid on a monthly basis. The interest rates vary from 12.0 percent to 13.5 percent.

Many of the promissory notes are dated September 1, 2005. (JES 6–12, 14–51, 121–123, 171, 290, 320, 328, 346, 351, 364, 389, 395, and 396).[65] All of the notes dated September 1, 2005, are due and payable on November 30, 2006, i.e., after the September 6, 2006 deadline for Centex to exercise its purchase option.[66] Several promissory notes are dated after September 1, 2005, but have a maturity date of September 6, 2006, i.e., the same as the Centex option deadline. (JES 53, 55–65).[67] Additional promissory notes dated after September 1, 2005, have maturity dates of February 28, 2007 (JES 54, 79–84, 345, 351) or June 30, 2007 (JE 78). A substantial number of promissory notes issued to individual lenders dated at or near the Centex option deadline have no definite maturity dates at all, but contain the following language under the heading Maturity Date: "At this time, this loan is on a month-to-month basis with interest being paid as agreed. An update on the project shall be provided to Lender on a quarterly or bi-annual basis with immediate notification when a fully executed Option to Purchase Agreement has been received and a maturity date established." (JES 69–77, 85–89, 91, 93, 97–99, 112).[68]

Some individual lenders who received promissory notes from Lenders also may have received copies of the Lenders Operating Agreement.[69] Murdock, Zomorodi, Sassan, and Nyman received copies, but it is not clear whether any of them read the document. Some individual lenders who received promissory notes from Lenders may have been informed separately of the existence of Lenders or an unnamed separate party that would be lending funds to St. Rose to complete the purchase of the Property in 2005. Zomorodi, who is Rad's brother-in-law, understood that there would be one entity to own the Property and another entity to loan funds to the other entity to acquire the Property. Rad's second cousin, Yehuda, through his son, Sassan, had the same understanding

65. One promissory note dated August 19, 2005, in the amount of $500,000, however, was issued by Rad and Nourafchan in favor of Majid Tabibzadeh and Debbie Elghanian. (JE 387).

66. There is one promissory note in the amount of $70,000 dated September 13, 2005, in favor of Ebrahim Noorani that also is due and payable no later than November 30, 2006. There is no explanation of whether this note represents funds deposited prior to the purchase of the Property by St. Rose.

67. The total amount due on September 6, 2006, under these promissory notes is $2,050,000.

68. There are many promissory notes issued in favor of Investment Group that contain the same unknown maturity date. (JES 67, 90, 92, 94–96, 100–111, 113–120, 124–152). This language might make sense for the notes dated after Centex terminated its purchase op-tion in August 2006. There are two other notes dated May 23, 2006 (JE 66) and August 1, 2006 (JE 68), however, that contain the same language. It is inexplicable why this language would be included in two notes issued when the fully-executed Centex purchase option agreement was still in effect.

69. Form transmittal letters dated August 31, 2005, on Investment Group letterhead, may have been sent to individual lenders. Those form letters may have accompanied the promissory notes given to the individual lenders. Those letters also stated that a separate package would be delivered that includes "a Deed of Trust and an Operating Agreement for R & S St. Rose Lenders, LLC." (JE 564). Some individual lenders, such as Murdock, received a transmittal letter having a different specific date, but containing the same language. (JE 293).

as Zomorodi.[70] Nourafchan's daughter, Poopak, was not aware of Lenders when she wrote her check on August 21, 2005, but became aware of Lenders after she received her promissory note. Nourafchan's son, Romyar, knew at the time he wrote his check on August 21, 2005, that Lenders is separate from St. Rose, but does not recall why he knew of the difference.[71] Merle Harris's son, Steven, made loans both before and after the Property was acquired by St. Rose, but had no knowledge of when Lenders or St. Rose were formed, and had no discussions with Rad, Nourafchan or his father as to any distinction between the entities. Majid thought he was lending funds to Lenders, even though he and his wife made their $500,000 check out to R & S Investment dated August 10, 2005, and received a promissory note from Rad and Nourafchan. Nyman received a promissory note from Lenders dated September 1, 2005, but does not recall making any distinction between Lenders and St. Rose, and does not recall why he received a copy of the Lenders Operating Agreement. Rahimi made a $300,000 check out to R & S Investment dated August 15, 2005, but does not know if he ever distinguished between Lenders and St. Rose.

Setareh was brought into the project by his father in 2006 after the Property was acquired by St. Rose, but had no knowledge of the details of the transaction and has no recollection of seeing Lenders' name before receiving the promissory note. Hamadani also loaned money to the project in November 2006 after the Prop-

erty was acquired by St. Rose and believes she was lending the funds to Lenders.

None of the individual lenders who testified sought or received any information concerning the financial resources of Lenders, either before or after the Property was acquired by St. Rose. Some had a history of successful investments involving Rad or Nourafchan, or with Brad Burns or Merle Harris, or were aware of Rad's success in other real estate ventures. Others, such as Zomorodi, may have personally visited the Property,[72] but none conducted any "due diligence" concerning the financial capabilities of Lenders. Certain others, such as Poopak and Sassan, took into account the anticipated purchase of the Property by Centex as well as the attractive interest rate for their loans, but even those individual lenders did not seek information as to how Lenders would be able to repay their promissory notes if the project failed.

Rad does not know what was told to individual lenders who were brought into the project by Brad Burns and Merle Harris, nor does he know what Cargill told individual lenders who called the office for information about sending their funds. Nourafchan got his son Romyar and his daughter Poopak to loan funds, but does not believe that his daughter was in any position to distinguish between Lenders and St. Rose. Burns does not know whether individual lenders were told that Lenders would be formed to loan funds to St. Rose for the purpose of acquiring the Property. Merle Harris has no recollec-

---

**70.** Zomco as well as Yehuda, made loans both before and after the Property was acquired by St. Rose and received separate promissory notes from Lenders.

**71.** Poopak as well as Romyar, made loans both before and after the Property was ac-

quired by St. Rose and received promissory notes from Lenders.

**72.** Rahimi could not recall whether he visited the Property or conducted any due diligence before making his loan.

tion of ever discussing a distinction between Lenders and St. Rose.[73]

For St. Rose to close escrow on the Property on August 25, 2005, funds from the Acquisition Loan had to be deposited along with additional funds received from the individual lenders. Those additional funds were intended to be encompassed by the St. Rose Note in favor of Lenders, the repayment of which was secured by the St. Rose DOT. That deed of trust was recorded on August 26, 2005. Because St. Rose acquired title to the Property no later than August 26, 2005, any funds loaned to the project by individual lenders after that date could not have been for the purpose of acquiring the Property.[74] Rad acknowledged that the funds received from individual lenders after the Property was acquired were used to pay interest to individual lenders, pay property taxes and administrative costs, and occasionally to substitute a later individual lender for an earlier lender. Rad also acknowledged that the St. Rose Note as well as the St. Rose DOT were never modified or amended to account for the funds provided by later individual lenders. As a result, even though Rad further acknowledged that in-

dividual lenders eventually had loaned approximately $19 million toward the project, the only promissory note in favor of Lenders, secured by the Property, was in the amount of $12 million.

### B. The 2007 Construction Loan from Colonial Bank.

Colonial Bank loaned up to $43,980,000 to St. Rose as memorialized in a Construction Loan Agreement effective July 27, 2007. (JES 216, 404, 589 and 596). The agreement is signed by Rad and Nourafchan on behalf of both Forouzan and RPN as the managers of St. Rose. It provided for an initial disbursement of proceeds to pay off the Acquisition Loan, and certain loan and underwriting fees. All subsequent disbursements were subject to various conditions. The Construction Loan Agreement also required St. Rose to commence construction on the Property within 30 days and to close escrow on the sale of sufficient improvements to make a principal reduction of $15,000,000 within 12 months. The Construction Loan Agreement also provides, inter alia, that the loan is guaranteed by Rad and Nourafchan. A Guarantee was signed by Rad and Nouraf-

73. Even though the articles of organization for Lenders filed on August 2, 2005, listed Merle Harris as a manager, Rad could not recall ever discussing with Merle Harris that he would be listed. On March 3, 2009, Rad filed a certificate with the Nevada Secretary of State correcting the articles of organization and explaining that Merle Harris has never been and is not now a manager of Lenders. (JE 172). On October 13, 2009, the annual list of managers or managing members filed for Lenders did not include Merle Harris as either a manager or managing member. (JE223).

74. Cargill testified that she prepared the promissory notes from Lenders within days of depositing checks received from the individual lenders. Thus, while most of the individual lenders received promissory notes dated Sep-

tember 1, 2005, their checks could have been deposited prior to the August 25, 2005 escrow closure date. For example, Poopak and Romyar provided checks dated August 21, 2005, that were deposited into a St. Rose account at Colonial Bank on August 22, 2005 (JE 479), but their promissory notes from Lenders were both dated September 1, 2005. (JES 12, 320, 395, and 396). Both Cargill and Rad testified that Lenders did not have a bank account at the time the Property was acquired by St. Rose. Rad acknowledged that, according to the St. Rose checking account statement for August 2005, $10,425,015 had been deposited into that account and $10,300,000 had been withdrawn from the account. The later sum was used to close escrow on the purchase of the Property and that sum is reflected on the escrow closing statement. (JES 281 and 585).

chan effective July 27, 2007. (JES 270 and 596).

In the same capacities, Rad and Nourafchan also signed a Promissory Note Secured by Deed of Trust ("Construction Loan Note") in the same amount and on the same date as the Construction Loan Agreement. (JES 217 and 596). That promissory note had a maturity date of eighteen months after recordation of the deed of trust securing the note.

Before the Construction Loan Agreement was completed, a preliminary title report on the Property was prepared as of June 20, 2007. (JE 168). Schedule "B" to the title report lists 47 coverage exceptions, item 35 being the deed of trust securing the obligation of St. Rose under the Acquisition Loan, and item 37 being the second deed of trust securing the obligation of St. Rose under the St. Rose Note. On July 27, 2007,. counsel for Colonial Bank provided escrow instructions to Nevada Title authorizing escrow to close upon receipt of a title insurance policy from Commonwealth insuring Colonial Bank's deed of trust, subject only to exceptions 1 through 34 and 38 through 42 appearing on the preliminary title report. (JE 167). The instructions also state that the existing deed of trust in favor of Colonial Bank, i.e., securing the Acquisition Loan, appearing as item 35 of the preliminary title report, will be reconveyed. On July 27, 2007, Rad and Nourafchan also signed a Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rents in favor of Colonial Bank under the Construction Loan Agreement, that was recorded in Clark County

on July 31, 2007 ("Construction Loan DOT"). (JES 209 and 403). On July 31, 2007, a Loan Policy of Title Insurance, No. 562–Z093126, was issued by Commonwealth in favor of Colonial Bank. (JES 218 and 405).[75] On July 31, 2007, Rad signed an estimated borrower statement prepared by Nevada Title reflecting that the balance of the Acquisition Loan would be paid from the proceeds of the Construction Loan. (JE 219).

Colonial Bank entered into a Loan Participation Agreement on September 26, 2007, with Community Bank of Nevada. (JE 169). Under that agreement, Community Bank of Nevada acquired an undivided 33.3674% interest in the Construction Loan for a participant fee of $110,062.50.

After the Construction Loan, Lenders apparently issued only one promissory note dated March 1, 2008, in favor of an individual lender. (JE 112). Lenders also issued other promissory notes primarily in favor of Investment Group. (JES 102–111, 113–120, 124–152).

Although the full amount of the Construction Loan was $43,980,000, St. Rose apparently did not complete significant improvements to the Property and did not draw the full amount of the loan.[76] In October 2008, Colonial Bank ceased allowing additional advance on the Construction Loan and Rad attempted thereafter to negotiate a modification of its terms, including a release of any guarantees. (JE 506).[77]

### C. *Presence of a Single Economic Unit.*

Colonial Bank entered into the Acquisition Loan Agreement in 2005 only with St.

**75.** That title policy appears to be consistent with the exclusions referenced in the escrow instructions.

**76.** BB & T's POC 5–1 is in the amount of $38,539,707.47, i.e., less than the full amount of the Construction Loan.

**77.** Letters dated December 4, 2008 and January 4, 2009, from Rad to Colonial Bank are found at CB000646–47 and CB000650.

Rose and not with Lenders. The loan was guarantied by Rad and Nourafchan. Lenders was not a party to the Acquisition Loan Agreement, nor did Lenders guaranty the obligations under the Acquisition Loan Agreement. Lenders was not a signatory to the Acquisition Loan and was not a guarantor of the promissory note. Hicks worked at Colonial Bank after the Acquisition Loan Agreement was consummated, but has no knowledge of whether Colonial Bank was even aware of the existence of Lenders at the time it completed that loan to St. Rose. Hicks did not produce a Colonial Bank file for the Acquisition Loan, but instead produced the file for the Construction Loan. None of the documents in that loan file infer that Colonial Bank took Lenders into consideration in making the Acquisition Loan. Thus, there is no evidence that Colonial Bank dealt with St. Rose and Lenders as a single economic unit or as separate economic units in connection with the Acquisition Loan.

Colonial Bank entered into the Construction Loan Agreement in 2007 only with St. Rose and not with Lenders. The Construction Loan also was guarantied by Rad and Nourafchan. By the time the Construction Loan Agreement was negotiated in 2007, Colonial Bank was well aware that Lenders had recorded the St. Rose DOT in second position against the Property securing the $12 million St. Rose Note. On May 17, 2007, Colonial Bank expressly required Lenders to subordinate the St. Rose DOT in connection with a modification extending the due date of the Acquisition Loan. Hicks acknowledged that the subordination agreement was part

of the Colonial Bank file for the Construction Loan. Prior to the completion of the Construction Loan, counsel for Colonial Bank prepared escrow instructions requiring the receipt of a title insurance policy that did not exclude the St. Rose DOT. Thus, even though Lenders was not a party to the Construction Loan Agreement, was not a signatory to the Construction Loan Note, and was not a guarantor of the Construction Loan Agreement or the Construction Loan Note, Colonial Bank clearly was aware of Lenders' position in the chain of title to the Property. Colonial Bank's undisputed conduct plainly establishes that it dealt with Lenders as an economic unit separate from St. Rose.

The individual lenders provided funds that were used by St. Rose to acquire the Property in August 2005. After the Property was acquired, the individual lenders also provided funds that were used to make interest payments on the various promissory notes, to pay property taxes and administrative expenses, and to substitute individual lenders. At the time they provided funds to the project, some of the individual lenders were aware of the existence of Lenders or of another party that would loan the funds to St. Rose for the project.[78] But their awareness of Lenders or of possibly another party did not result in their treatment of Lenders or another party as entities separate from St. Rose. None of the individual lenders investigated whether Lenders had the ability to repay their loans if the Property did not sell. None of the individual lenders made their checks payable to Lenders.[79] None of the individual lenders questioned that they

---

78. Rad testified that he informed the individual lenders he spoke to that Lenders would be formed to loan their funds to St. Rose. He does not know, however, what Merle Harris or Burns may have told other individual lenders.

79. The only two exceptions were the Zomco check where Rad filled in the name of the payee, *see* note 55, *supra,* and the Double E Family check provided by Brad Burns. *See* note 56, *supra.*

were receiving monthly interest payments and annual 1099s from St. Rose rather than Lenders even though their promissory notes were from Lenders. Thus, while some of the individual lenders may have been aware of a separate lending entity or even specifically of Lenders, all of the individual lenders dealt with Lenders and St. Rose as a single economic unit.

The individual lenders' dealings with Lenders and St. Rose did not change in relationship to either the Acquisition Loan or the Construction Loan. All of the promissory notes dated September 1, 2005, were payable at interest rates ranging from 12.0 to 13.5 percent and were due no later than November 30, 2006. The due date was based on the deadline for Centex to exercise its option to acquire the Property from St. Rose for the amount of $54,102,000, no later than September 6, 2006. Upon exercise of the option, the $12,000,000 St. Rose Note would be due, providing sufficient funds to Lenders to pay the individual lenders by the November 30, 2006 due date on their promissory notes.[80] However, after Centex declined to exercise its option in August 2006, essentially forfeiting the $8 million it contributed for St. Rose to acquire the Property, Lenders did not have the ability to satisfy the promissory notes to the individual lenders.

In spite of this fundamental change in the expected date of repayment of their 2005 loans, i.e., that they would be paid off in about a year through the purchase by Centex, most of the individual lenders apparently were satisfied as long as they continued to receive their monthly interest checks from St. Rose and continued to receive their 1099s from St. Rose. After the Centex sale fell through, the individual lenders were requested to extend the terms of their promissory notes so that a new buyer could be located or the Property could be developed. Most of the individual lenders agreed to one or more extensions of their promissory notes, even though the letters requesting the extensions made no mention of Lenders. (JES 159, 173–178, 266–269, 374, 575–576, and 623).

Similarly, the Construction Loan obtained by St. Rose in 2007 had no impact on how the individual lenders dealt with Lenders and St. Rose. The initial disbursement from the Construction Loan paid off St. Rose's obligation on the Acquisition Loan, but none of the obligation under the St. Rose Note. This was consistent with the stated maturity date of the St. Rose Note where repayment was conditioned upon sale of the Property to Centex or to another purchaser. Additionally, there were no subsequent disbursements from the Construction Loan to St. Rose that were applied to St. Rose's obligation to Lenders. The individual lenders, however, continued to receive their monthly interest payments from St. Rose (JES 310, 579) as well as their annual 1099s. (JES 291, 296, 301, 323, 332, 341, 342, 357, 368, 392, 419, 561).

Cargill testified that no further monthly interest payments were made after September 2008 because no money was available. She testified that on or about September 2, 2008, the obligations owed by St. Rose to the individual lenders were reclassified to be obligations owed by Lenders.

---

**80.** There were a number of promissory notes to individual lenders that had the same due date as the deadline for Centex to exercise its purchase option, i.e., September 6, 2006. As previously discussed in note 67, *supra*, the total amount owing under those notes was $2,050,000. It is not entirely clear whether the $12 million paid to Lenders under the St. Rose Note would have been sufficient to satisfy the obligations to holders of the September 1, 2005 notes, once the $2,050,000 amount was paid to the other note holders.

(JE 425). A balance sheet for Lenders as of September 8, 2008, was created showing its liabilities to the individual lenders brought into the project by Merle Harris and Brad Burns, as well as Rad and Nourafchan. (JE 162). This reclassification activity, including the creation of the balance sheet, coincided with confirmation from Nevada Title (JE 376) that the St. Rose DOT in favor of Lenders securing the St. Rose Note was recorded ahead of the Construction Loan DOT in favor of Colonial Bank securing the Construction Loan.

After the monthly interest payments stopped, however, the individual lenders took different approaches. Brad Burns' father, Marvin, took no legal action against either St. Rose or Lenders. Zomorodi considered suing Lenders and was requested by Murdock and Keach to join in their State Court Action, but declined to do so. Nourafchan's children, Poopak and Romyar, took no action. Sassan considered taking legal action only against Lenders because he does not believe his father, Yehuda, has any legal claims against St. Rose. Merle Harris's son, Steven, took no action against either St. Rose or Lenders. Majid understood he was lending money to Lenders, but took no action against Lenders. Nyman sued St. Rose, Lenders, Rad, Nourafchan, and others. Rahimi does not believe St. Rose is obligated on the loan, but took no legal action against Lenders. Setareh and Hamadani took no action against St. Rose or Lenders. Not surprisingly, Rad, Nourafchan, Brad Burns, and Merle Harris, as well as Investment Group, took no action against St. Rose or Lenders with respect to any loans they made in connection with the project.[81]

Based on the preceding discussion, the court concludes that Colonial Bank dealt with St. Rose and Lenders as separate economic units in connection with the Construction Loan. Other than Hicks, BB & T presented no testimony from any representatives from Colonial Bank or its counsel involved in the negotiations of either the Acquisition Loan or the Construction Loan. No testimony was presented from any representative of Nevada Title to suggest that a subordination agreement previously required in connection with the modification of the Acquisition Loan was not required in connection with the Construction Loan.

The court also concludes that some of the individual lenders had knowledge of the existence of Lenders or the possibility of some other entity acting as a lender to St. Rose, but the individual lenders did not deal with Lenders as a separate economic unit. While Lenders was the maker of virtually all of the promissory notes, the individual lenders received all of their monthly payments and annual 1099s from St. Rose rather than Lenders. The individual lenders who did receive the Lenders Operating Agreement did not, in fact, have any significant dealings with Lenders prior to cessation of monthly interest payments.

In this case, the evidence establishes that the largest single creditor by dollar amount, Colonial Bank, dealt with St. Rose and Lenders as separate economic units. The evidence also establishes that the largest number of creditors, the individual lenders, dealt with St. Rose and Lenders as a single economic unit.

### D. *Reliance on Separate Identities in Extending Credit.*

As previously discussed, Colonial Bank did not loan any funds to Lenders in con-

---

**81.** Some or all of them have filed proofs of claim in either or both Chapter 11 proceed- ings commenced by St. Rose and Lenders.

nection with the Acquisition Loan or the Construction Loan. It did not choose to loan money only to St. Rose rather than Lenders, because Lenders never applied for a loan. Colonial Bank's decision to extend credit did not rely on Lender's assets at all. The loan file produced by Hicks references "R & S Lenders Group, LLC" as a potential guarantor of the Construction Loan in addition to Rad and Nourafchan,[82] but no guaranty was sought or obtained from Lenders in approving the Construction Loan. Hicks, the only witness who worked at Colonial Bank during the period when the Construction Loan was made, could not testify that he was involved in the decision to make the loan. Instead, he only testified that, according to a loan committee memorandum that he did not prepare, Colonial Bank requested a first deed of trust against the Property and that Colonial Bank would look to its collateral and then the guarantors if necessary to collect the Construction Loan. In other words, the only evidence elicited from a Colonial Bank representative provided no proof that Colonial Bank relied on the separate assets of Lenders in deciding to make the Construction Loan to St. Rose.[83]

Also as previously discussed, the individual lenders were indifferent to the separate existence of Lenders in loaning their funds both before the Property was acquired by St. Rose and after it was acquired. Except for Zomco, none of the individual lenders wrote checks payable to Lenders, and even that check was filled in by Rad. The individual lenders received promissory notes payable by Lenders and none of them objected, not even R. Setareh, who requested but did not receive a note payable by Rad and Nourafchan. None of the individual lenders requested that their loans be rescinded when they received monthly interest payments from St. Rose, nor when they received their annual 1099s from St. Rose rather than Lenders. In short, just as Colonial Bank did not rely on the assets of Lenders in making the Construction Loan to St. Rose, the individual lenders also did not rely on the specific assets of either entity in loaning their funds to the project.

### E. Application of the First Bonham Factor to All Creditors.

The first Bonham Factor is not present with respect to Colonial Bank. Colonial Bank treated St. Rose and Lenders as separate economic units in connection with the Construction Loan. It did not rely on the assets of Lenders in making the Construction Loan to St. Rose.

The first Bonham Factor may be present with respect to the individual lenders. Although certain individual lenders were aware of Lenders or of the possibility of additional parties as separate legal entities, they treated St. Rose and Lenders as a single economic unit with respect to the

---

**82.** The Colonial Bank loan file (JE 596) contains 487 pages, only certain pages of which were the subject of an objection by Lenders. *See* note 20, *supra.* Each page in the exhibit includes a "Bates" stamp. The entire exhibit is marked sequentially as Bate stamp pages CB000538 through CB001024. Pages CB000546 through CB000555 appear to be pages 6 through 15 of a Colonial Bank loan memorandum dated June 12, 2007, in connection with the Construction Loan. The reference to R & S Lenders Group, LLC appears under the heading "Proposed Loan Request" at CB 000547.

**83.** This is virtually the opposite of *Bonham* where the investors who opposed substantive consolidation failed to prove that they relied on the separate credit of the non-debtor entities in entering into the subject investment contracts. 229 F.3d at 767. In the present case, the proponent of substantive consolidation has affirmatively demonstrated that its predecessor in interest, Colonial Bank, did not rely on the separate credit of Lenders.

repayment of their loans. The individual lenders relied on the sale of the Property as the source of repayment of their loans, but did not rely on the particular assets of either entity in making the loans.

Because St. Rose's obligation on the Construction Loan far exceeds the claims of the individual lenders, Colonial Bank's treatment of the debtor entities as separate economic units is the most significant. The loan committee memorandum produced by Hicks as part of the Colonial Bank loan file demonstrates exactly what Hicks attested: Colonial Bank would look first to the sale of the Property to repay the Construction Loan and then to Rad and Nourafchan. The expectations of Colonial Bank also were mirrored in a Loan Approval Report/Request dated June 6, 2007,[84] where "sale of land to ultimate end users" is identified as the primary repayment source and "Guarantors cash flow/assets" is identified as the secondary repayment source. The only guarantors identified in the document are Nourafchan and Rad.

Hicks' testimony, as well as the Colonial Bank file for the Construction Loan, permits only one inference critical to the substantive consolidation analysis: Colonial Bank never expected to have the assets of Lenders available to satisfy the Construction Loan. *See Bonham,* 229 F.3d at 766 (the first Bonham Factor "is based on the consideration that lenders 'structure their loans according to their expectations regarding th[e] borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets.' "), *quoting Augie/Restivo,* 860 F.2d at 518–19. As Colonial Bank's successor,

it is easy to understand why BB & T has focused on the individual lenders rather than Colonial Bank's actions in connection with the largest claim against the bankruptcy estates. Whatever may be the actual understanding and expectations of all of the individual lenders, the evidence establishes that the largest creditor in this bankruptcy proceeding never treated St. Rose and Lenders as a single economic unit and never relied on the assets of Lenders in making the Construction Loan to St. Rose.

Under these circumstances, the court concludes that the first Bonham Factor is not present. On this basis, the Consolidation Motion must be denied.

As a separate, independent, and additional basis, the court also considers whether substantive consolidation would be warranted even if the understandings and expectations of the individual lenders are sufficient to establish the first Bonham Factor.

## II. *Would Substantive Consolidation Ensure the Equitable Treatment of All Creditors?*

In weighing the expectations of all creditors, the court obviously must consider the time at which the creditors in this case extended the relevant credit. For Colonial Bank, the relevant time was the Construction Loan entered in August 2007, for which its successor claims that more than $35 million remains owing. For the individual lenders, most of them extended the relevant credit in connection with the purchase of the Property in August 2005. Other individual lenders loaned funds after the Property was acquired. Rad testified that those additional loans totaled approxi-

**84.** This document also appears a part of the Colonial Bank loan file in JE 596 and is marked as pages CB000539.

mately $7 million. Both Colonial Bank and the individual lenders expected that their respective loans would be protected by the Property: Colonial Bank through a deed of trust and the individual lenders through a sale. Colonial Bank expected that its position would be protected through a first deed of trust or the presence of title insurance preserving that position. The individual lenders expected to be paid when the Property was sold and many, such as Murdock, Zomorodi, Poopak, Sassan, Steven, and Romyar, expected their loans to be secured in some fashion by a deed of trust against the Property.[85]

St. Rose had title to the Property while Lenders had the $12 million St. Rose Note secured by the St. Rose DOT against the Property. Unlike Colonial Bank, Lenders did not have title insurance. But like Colonial Bank and the individual lenders, the expectation of St. Rose was to pay the Construction Loan and the St. Rose Note through sale or development of the Property, and the expectation of Lenders was to repay its promissory notes to individual lenders through sale or development of the Property.

In this instance, the evidence establishes that Colonial Bank clearly knew that Lenders had the St. Rose DOT against the Property securing the $12 million St. Rose Note. When Colonial Bank agreed to extend the maturity date of the Acquisition Loan in May 2007, it requested and obtained from Lenders a subordination agreement. When Colonial Bank agreed two months later to the Construction Loan, it continued to be aware of the St. Rose DOT in favor of Lenders and Commonwealth also was aware of the same

deed of trust when it issued the title insurance policy. Colonial Bank's attorney specifically instructed Nevada Title to close the escrow on the Construction Loan upon receipt of the Commonwealth title policy without exception of the St. Rose DOT, but nevertheless, Nevada Title closed escrow without obtaining another subordination agreement from Lenders or a reconveyance of the St. Rose DOT. In essence, Colonial Bank, through its counsel, obtained the Commonwealth title insurance policy as protection against the very risk that its deed of trust securing the Construction Loan would not be in first position.

As previously mentioned, Lenders filed a proof of claim in the St. Rose proceeding in the secured amount of $12 million based on the St. Rose Note and the St. Rose DOT. If substantive consolidation results in the merging of all assets and liabilities between Lenders and St. Rose, Lenders' claim against St. Rose based on the St. Rose Note will be extinguished, resulting in no obligation to support the lien of the St. Rose DOT. The likely effect would be that Colonial Bank's deed of trust against the Property obtains priority status because the St. Rose DOT also would be ineffective. The damages caused by Nevada Title's failure to obtain a subordination agreement before closing escrow on the Construction Loan would be minimized. Commonwealth's obligation under the title insurance policy also would be eliminated inasmuch as Colonial Bank's deed of trust would be in first position. Any collateral claims arising from the State Court Action also would be diminished. In effect, the

---

**85.** Colonial Bank also obtained guarantees from Rad and Nourafchan in connection with both the Acquisition Loan and Construction Loan, while certain of the individual lenders, such as Majid and R. Setareh, wanted Rad and Nourafchan to be personally obligated on their loans. Due to the language of Paragraph 15 in each of the promissory notes, *see* discussion at note 24, *supra*. Rad and Nourafchan may have joint and several liability personally for each of the promissory notes to the individual lenders.

impact to BB & T and Commonwealth of the unfavorable outcome of the State Court Action would be mitigated.[86]

Unfortunately, the expectations of the individual lenders to be paid from the sale of the Property would not be met. The expectations of some individual lenders that their loans would be secured in some fashion by a deed of trust against the Property would not be met. The expectation that the individual lenders would be paid any amounts on their claims in the Lenders bankruptcy proceeding would not be met.

In the Remand Order, the USDC observed as follows:

> The best interest of some creditors may be to receive treatment at the expense of, and which is unfair to, other creditors. Such would result in the inequitable treatment of all creditors. Such inequitable treatment can arise through the continued recognition of a claim created between entities when both entities disregarded corporate formalities and commingled assets.

Remand Order at 7:26 to 8:4. In this case, no one disputes that Lenders had been formed on August 2, 2005, before St. Rose acquired the Property on August 26, 2005. No one disputes that Lenders was formed before the St. Rose Note was created on August 23, 2005, and before the St. Rose DOT was recorded on August 26, 2005. No one disputes that the St. Rose Note encompasses the funds provided by the individual lenders to acquire the Property. There simply is no evidence supporting the conclusion that the evils occasioned by disregarding corporate formalities and commingling assets exist with respect to the St. Rose Note.

In considering the equitable treatment of all creditors in the Lenders and St. Rose bankruptcy proceedings, the court is limited to the property of the bankruptcy estates. In this instance, property of the St. Rose estate consists primarily of the Property that was sold for $13,500,000 pursuant to its confirmed liquidating Chapter 11 plan. Liens against the Property asserted by Lenders and Colonial Bank attached to the proceeds of that sale. Property of the Lenders bankruptcy estate consists primarily of its secured and unsecured claims against the St. Rose estate.

The parties in this case have disputed whether it is appropriate for this court to consider other avenues of recovery that may be available to the claimants. For Colonial Bank, the record indicates that the personal guarantees of Rad and Nourafchan may be available for any unsatisfied portion of the Construction Loan. Likewise, the record indicates that claims against Nevada Title may be pursued that are encompassed by the Commonwealth title insurance policy. The extent of BB & T's recovery as successor in interest to the Construction Loan is subject to the application of the CSLA as well as the claims it may have against any professionals. The extent of Commonwealth's recovery on the claim assigned by Murdock and Keach is subject to the funds available to the bankruptcy estates. None of these claims constitute property of the bankruptcy estates of St. Rose or Lenders.

Similarly, for the individual lenders, the record indicates that none of them received personal guarantees from Rad and Nourafchan, and only a few such as Murdock, Reach and Nyman, have pursued

---

**86.** This appears to be consistent with the "How Nevada Title Wins" litigation strategy suggested by Murdock in an email to Commonwealth's in-house counsel, dated April 30, 2010 (JE 197), well before the judgment in favor of Murdock and Keach was acquired by Commonwealth.

litigation against Rad and Nourafchan. None of the claims of the individual lenders constitute property of the bankruptcy estates.

While substantive consolidation may permit the merger or pooling of assets, it does not create additional assets for distribution to creditors.[87] The collateral sources of recovery potentially available to BB & T as well as the individual lenders clearly are not property of the bankruptcy estates that can be marshaled to pay other creditors' claims. The potential presence or absence of alternative sources of recovery to any of the creditors therefore is immaterial to the outcome of the Consolidation Motion.

When balancing the benefits that substantive consolidation would bring against the harms that it would cause, the court concludes that substantive consolidation would be contrary to the expectations of Colonial Bank and the individual lenders. Moreover, substantial harm would be visited upon the Lenders estate because the proceeds of the Property sale likely would go entirely to BB & T on its secured claim and would be unavailable to satisfy any of the claims of the individual lenders. As the USDC noted, this result might be in the best interest of BB & T, and perhaps Commonwealth, Nevada Title and BB & T's prior counsel, but it would come at the expense of the individual lenders. That result would not be equitable to all creditors. For these reasons, substantive consolidation is not appropriate in these proceedings even if the first Bonham Factor is present.

## CONCLUSION

For both the reasons discussed above, the Consolidation Motion will be denied. This memorandum decision constitutes the court's findings of fact and conclusions of law under FRBP 9014, FRBP 7052 and FRCP 52. A separate order denying the Consolidation Motion has been entered concurrently herewith.

---

**87.** Unlike Bonham, substantive consolidation will not facilitate the pursuit of potential avoidance actions between the debtor estates, nor against non-debtor parties. See Bonham, 229 F.3d at 768–769. Avoidance actions serve to equitably redistribute assets that are transferred by a debtor to the detriment of other creditors. The court in Bonham sought to preserve the bankruptcy trustee's avoidance claims in order to permit later investors to share in the distributions made to earlier investors. Id. at 767–768. Nothing in Article X, B(2) of the confirmed St. Rose Plan preserved any avoidance actions otherwise available to the bankruptcy estate, nor did it extend the two-year deadline under Section 546 to commence any such actions. Likewise, the deadline under Section 546 for Lenders to pursue any avoidance claims apparently has expired. Thus, no benefit to creditors comparable to that achieved in Bonham will result from the substantive consolidation requested in this case. More important, exactly the opposite would occur: the St. Rose Note would be eliminated by substantive consolidation and BB & T would receive all of the proceeds of the sale of the Property pursuant to the Colonial Bank deed of trust.